CALIFORNIA ET AL. *v.* DEEP SEA RESEARCH,
·INC., ET AL.

No. 96–1400.   Argued December 1, 1997—Decided April 22, 1998

492

O'CONNOR, J., delivered the opinion for a unanimous Court. STEVENS, J., filed a concurring opinion, *post*, p. 509. KENNEDY, J., filed a concurring opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 510.

*Joseph C. Rusconi,* Deputy Attorney General of California, argued the cause for petitioners. With him on the briefs were *Daniel E. Lungren,* Attorney General, *Roderick E. Walston,* Chief Assistant Attorney General, *Richard M. Frank,* Assistant Attorney General, *Dennis M. Eagan,* Deputy Attorney General, *Jack Rump,* and *Peter Pelkofer.*

*David C. Frederick* argued the cause for the United States, respondent under this Court's Rule 12.6, in support of petitioners. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Deputy Assistant Attorney General Preston,* and *Richard A. Olderman.*

*Fletcher C. Alford* argued the cause for respondent. With him on the brief were *Stuart M. Gordon, David Collins,* and *David J. Bederman.*\*

JUSTICE O'CONNOR delivered the opinion of the Court.

This action, involving the adjudication of various claims to a historic shipwreck, requires us to address the interaction between the Eleventh Amendment and the *in rem* admiralty jurisdiction of the federal courts. Respondent Deep Sea Research, Inc. (DSR), located the ship, known as the S. S. *Brother Jonathan,* in California's territorial waters. When DSR turned to the federal courts for resolution of its claims to the vessel, California contended that the Eleventh Amendment precluded a federal court from considering DSR's claims in light of the State's asserted rights to the *Brother Jonathan* under federal and state law. We conclude that the Eleventh Amendment does not bar the jurisdiction

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, and *Eric J. Taylor,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Michael J. Bowers* of Georgia, *Calvin E. Holloway, Sr.,* of Guam, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Charles Molony Condon* of South Carolina, *William H. Sorrell* of Vermont, *Richard Cullen* of Virginia, and *Alva A. Swan* of the Virgin Islands; for the Council of State Governments et al. by *Richard Ruda* and *James I. Crowley;* and for the National Trust for Historic Preservation et al. by *Robert A. Long, Jr., Paul W. Edmondson, Elizabeth S. Merritt, Thompson M. Mayes, Edith M. Shine,* and *Laura S. Nelson.*

Briefs of *amici curiae* urging affirmance were filed for the American Institute of Marine Underwriters by *Marilyn L. Lytle;* for the Atlantic Mutual Insurance Co. et al. by *Guilford D. Ware* and *Martha M. Poindexter;* for the Columbus-America Discovery Group et al. by *Richard T. Robol, Jane E. Rindsberg, Richard A. Cordray,* and *Alan G. Choate;* and for Salvors, Inc., by *Peter E. Hess.*

of a federal court over an *in rem* admiralty action where the res is not within the State's possession.

## I

The dispute before us arises out of respondent DSR's assertion of rights to both the vessel and cargo of the *Brother Jonathan,* a 220-foot, wooden-hulled, double side-wheeled steamship that struck a submerged rock in July 1865 during a voyage between San Francisco and Vancouver. It took less than an hour for the *Brother Jonathan* to sink, and most of the ship's passengers and crew perished. The ship's cargo, also lost in the accident, included a shipment of up to $2 million in gold and a United States Army payroll that some estimates place at $250,000. See Nolte, Shipwreck: Brother Jonathan Discovered, San Francisco Chronicle, Feb. 25, 1994, p. 1, reprinted in App. 127–131. One of few parts of the ship recovered was the wheel, which was later displayed in a saloon in Crescent City, California. R. Phelan, The Gold Chain 242 (1987).

Shortly after the disaster, five insurance companies paid claims totaling $48,490 for the loss of certain cargo. It is unclear whether the remaining cargo and the ship itself were insured. See Wreck of the Steamship Brother Jonathan, New York Times, Aug. 26, 1865, reprinted in App. 140–147. Prior to DSR's location of the vessel, the only recovery of cargo from the shipwreck may have occurred in the 1930's, when a fisherman found 22 pounds of gold bars minted in 1865 and believed to have come from the *Brother Jonathan.* The fisherman died, however, without revealing the source of his treasure. Nolte, *supra,* App. 130. There appears to be no evidence that either the State of California or the insurance companies that paid claims have attempted to locate or recover the wreckage.

In 1991, DSR filed an action in the United States District Court for the Northern District of California seeking rights to the wreck of the *Brother Jonathan* and its cargo under

that court's *in rem* admiralty jurisdiction. California intervened, asserting an interest in the *Brother Jonathan* based on the Abandoned Shipwreck Act of 1987 (ASA), 102 Stat. 432, 43 U. S. C. §§ 2101–2106, which provides that the Federal Government asserts and transfers title to a State of any "abandoned shipwreck" that either is embedded in submerged lands of a State or is on a State's submerged lands "and is included in or determined eligible for inclusion in the National Register,", § 2105(a)(3). According to California, the ASA applies because the *Brother Jonathan* is abandoned and is both embedded on state land and eligible for inclusion in the National Register of Historic Places (National Register). California also laid claim to the *Brother Jonathan* under Cal. Pub. Res. Code Ann. § 6313 (West Supp. 1998) (hereinafter § 6313), which vests title in the State "to all abandoned shipwrecks . . . on or in the tide and submerged lands of California."

The District Court initially dismissed DSR's action without prejudice at DSR's initiative. The case was reinstated in 1994 after DSR actually located the *Brother Jonathan* 4½ miles off the coast of Crescent City, where it apparently rests upright on the sea floor under more than 200 feet of water. Based on its possession of several artifacts from the *Brother Jonathan*, including china, a full bottle of champagne, and a brass spike from the ship's hull, DSR sought either an award of title to the ship and its cargo or a salvage award for its efforts in recovering the ship. DSR also claimed a right of ownership based on its purchase of subrogation interests from some of the insurance companies that had paid claims on the ship's cargo.

In response, the State of California entered an appearance for the limited purpose of filing a motion to dismiss DSR's *in rem* complaint for lack of jurisdiction. According to the State, it possesses title to the *Brother Jonathan* under either the ASA or § 6313, and therefore, DSR's *in rem* action against the vessel is an action against the State in violation

of the Eleventh Amendment. DSR disputed both of the State's statutory ownership claims, and argued that the ASA could not divest the federal courts of the exclusive admiralty and maritime jurisdiction conferred by Article III, §2, of the United States Constitution. DSR also filed a motion requesting that the District Court issue a warrant for the arrest of the *Brother Jonathan* and its cargo, as well as an order appointing DSR the exclusive salvor of the shipwreck.

The District Court held two hearings on the motions. The first focused on whether the wreck is located within California's territorial waters, and the second concerned the possible abandonment, embeddedness, and historical significance of the shipwreck, issues relevant to California's claims to the res. For purposes of the pending motions, DSR stipulated that the *Brother Jonathan* is located upon submerged lands belonging to California.

After the hearings, the District Court concluded that the State failed to demonstrate a "colorable claim" to the *Brother Jonathan* under federal law, reasoning that the State had not established by a preponderance of the evidence that the ship is abandoned, embedded in the sea floor, or eligible for listing in the National Register as is required to establish title under the ASA. 883 F. Supp. 1343, 1357 (ND Cal. 1995). As for California's state law claim, the court determined that the ASA pre-empts §6313. Accordingly, the court issued a warrant for the arrest of the *Brother Jonathan*, appointed DSR custodian of the shipwreck subject to further order of the court, and ordered DSR to take possession of the shipwreck as its exclusive salvor pending the court's determination of "the manner in which the wreck and its cargo, or the proceeds therefrom, should be distributed." *Id.*, at 1364.

The District Court stated that it was not deciding whether "any individual items of cargo or personal property have been abandoned," explaining that "[a]t this stage in the litigation, DSR is not asking the court to award it salvage fees from the res of the wreck, or to otherwise make any order

regarding title to or distribution of the wreck or its contents." *Id.*, at 1354. The District Court thought that the most prudent course would be to adjudicate title after DSR completes the salvage operation. Following the District Court's ruling, the United States asserted a claim to any property on the *Brother Jonathan* belonging to the Federal Government.

The State appealed, arguing that its immunity from suit under the Eleventh Amendment does not hinge upon the demonstration by a preponderance of the evidence that the ASA applies to the *Brother Jonathan.* 102 F. 3d 379, 383 (CA9 1996). According to the State, it had established sufficient claim to the shipwreck under state law by "assert[ing] that the *Brother Jonathan* is on its submerged lands and that . . . § 6313 vests title in the State to abandoned shipwrecks on its submerged lands." *Id.*, at 385. Underlying the State's argument was a challenge to the District Court's ruling that the ASA pre-empts the California statute. The State also maintained that it had a colorable claim to the *Brother Jonathan* under the ASA, arguing that it presented ample evidence of both abandonment and embeddedness, and that the District Court applied the wrong test by "requir[ing] that abandonment be shown by an affirmative act on the part of the original owner demonstrating intent to renounce ownership." *Ibid.*

The Court of Appeals for the Ninth Circuit affirmed the District Court's orders. The court first concluded that § 6313 is pre-empted by the ASA because the state statute "takes title to shipwrecks that do not meet the requirements of the ASA and which are therefore within the exclusive admiralty jurisdiction of the federal courts." *Id.*, at 384. With respect to the State's claim under the ASA, the court presumed that "a federal court has both the power and duty to determine whether a case falls within its subject matter jurisdiction," and concluded that "it was appropriate for the district court to require the State to present evidence that

the ASA applied to the *Brother Jonathan, i. e.,* that it was abandoned and either embedded or eligible for listing in the National Register, before dismissing the case." *Id.,* at 386. According to the court's reasoning, "in addressing the questions of abandonment, embeddedness, and historical significance of the wreck under the ASA, a federal court does not adjudicate the state's rights," because the ASA establishes the Federal Government's title to a qualifying shipwreck, which is then transferred to a State. *Id.,* at 387. Consequently, in the court's view, "a federal court may adjudicate the question of whether a wreck meets the requirements of the ASA without implicating the Eleventh Amendment." *Ibid.*

As to the specifics of the State's claim under the ASA, the court held that the District Court did not err in concluding that the State failed to prove that the *Brother Jonathan* is abandoned within the meaning of the statute. The court reasoned that, in the absence of a definition of abandonment in the ASA, "Congress presumably intended that courts apply the definition of abandonment that has evolved under maritime law." *Ibid.* In maritime law, the court explained, abandonment occurs either when title to a vessel has been affirmatively renounced or when circumstances give rise to an inference of abandonment. Here, the Court of Appeals concluded, the District Court's "failure to infer abandonment from the evidence presented by the State was not clearly erroneous," given the insurance companies' claims to the ship's insured cargo and undisputed evidence presented by DSR that the technology required to salvage the *Brother Jonathan* has been developed only recently. *Id.,* at 388. The court also rejected the State's bid to treat the uninsured portion of the wreck as abandoned, explaining that the District Court did not address the status of individual items of cargo or personal property, and that "divid[ing] the wreck of the *Brother Jonathan* into abandoned and unabandoned portions for the purposes of the ASA" would lead to both

federal and state courts adjudicating the wreck's fate, which, in the court's view, would be "confusing and inefficient," and also "inconsistent with the general rule in maritime law of treating wrecks as a legally unified *res*." *Id.*, at 389.

Summarizing its reasoning, the court stated that, "[b]ecause the law is reluctant to find abandonment, and because a finding of partial abandonment would deprive those holding title to the unabandoned portion of the wreck access to the federal forum, we hold that the *Brother Jonathan* is not abandoned." *Ibid.* (citation omitted). The court reserved the question whether there might be some point at which the insured portion of a shipwreck "becomes so negligible" that the entire wreck would be abandoned under the ASA. *Ibid.* The court also declined to take judicial notice of evidence that, during pendency of the appeal, the *Brother Jonathan* was determined eligible for inclusion in the National Register.

By concluding that the State must prove its claim to the *Brother Jonathan* by a preponderance of the evidence in order to invoke the immunity afforded by the Eleventh Amendment, the Ninth Circuit diverged from other Courts of Appeals that have held that a State need only make a bare assertion to ownership of a res. See *Zych* v. *Wrecked Vessel Believed to be the Lady Elgin*, 960 F. 2d 665, 670 (CA7), cert. denied, 506 U. S. 985 (1992); *Maritime Underwater Surveys, Inc.* v. *The Unidentified, Wrecked and Abandoned Sailing Vessel*, 717 F. 2d 6, 8 (CA1 1983).* We granted certiorari to address whether a State's Eleventh Amendment immunity in an *in rem* admiralty action depends upon evidence of the State's ownership of the res, and to consider the related

---

*While the petition for certiorari in this case was pending, the United States Court of Appeals for the Sixth Circuit adopted the reasoning of the Ninth Circuit. See *Fairport Int'l Exploration, Inc.* v. *Shipwrecked Vessel Known as The Captain Lawrence*, 105 F. 3d 1078 (CA6 1997), cert. pending, No. 96–1936.

questions whether the *Brother Jonathan* is subject to the ASA and whether the ASA pre-empts § 6313. 520 U. S. 1263 (1997).

## II

The judicial power of federal courts extends "to all Cases of admiralty and maritime Jurisdiction." Art. III, § 2, cl. 1. The federal courts have had a unique role in admiralty cases since the birth of this Nation, because "[m]aritime commerce was . . . the jugular vein of the Thirteen States." F. Frankfurter & J. Landis, The Business of the Supreme Court 7 (1927). Accordingly, "[t]he need for a body of law applicable throughout the nation was recognized by every shade of opinion in the Constitutional Convention." *Ibid.* The constitutional provision was incorporated into the first Judiciary Act in 1789, and federal courts have retained "admiralty or maritime jurisdiction" since then. See 28 U. S. C. § 1333(1). That jurisdiction encompasses "maritime causes of action begun and carried on as proceedings *in rem,* that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien." *Madruga* v. *Superior Court of Cal., County of San Diego,* 346 U. S. 556, 560 (1954).

The jurisdiction of the federal courts is constrained, however, by the Eleventh Amendment, under which "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the Amendment, by its terms, "would appear to restrict only the Article III diversity jurisdiction of the federal courts," *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 54 (1996), the Court has interpreted the Amendment more broadly. See, *e. g., Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991). According to this Court's precedents, a State may not be sued in federal court by one of its own citizens,

see *Hans* v. *Louisiana,* 134 U. S. 1 (1890), and a state official is immune from suit in federal court for actions taken in an official capacity, see *Smith* v. *Reeves,* 178 U. S. 436 (1900).

The Court has not always charted a clear path in explaining the interaction between the Eleventh Amendment and the federal courts' *in rem* admiralty jurisdiction. Early cases involving the disposition of "prize" vessels captured during wartime appear to have assumed that federal courts could adjudicate the *in rem* disposition of the bounty even when state officials raised an objection. See *United States* v. *Peters,* 5 Cranch 115, 139–141 (1809). As Justice Story explained, in admiralty actions *in rem,*

> "the jurisdiction of the [federal] court is founded upon the possession of the thing; and if the State should interpose a claim for the property, it does not act merely in the character of a defendant, but as an actor. Besides, the language of the [Eleventh] [A]mendment is, that 'the judicial power of the United States shall not be construed to extend to any suit *in law or equity.*' But a suit in the admiralty is not, correctly speaking, a suit in law or in equity; but is often spoken of in contradistinction to both." 2 J. Story, Commentaries on the Constitution of the United States § 1689, pp. 491–492 (5th ed. 1891).

Justice Washington, riding Circuit, expressed the same view in *United States* v. *Bright,* 24 F. Cas. 1232, 1236 (No. 14,647) (CC Pa. 1809), where he reasoned:

> "[I]n cases of admiralty and maritime jurisdiction the property in dispute is generally in the possession of the court, or of persons bound to produce it, or its equivalent, and the proceedings are in rem. The court decides in whom the right is, and distributes the proceeds accordingly. In such a case the court need not depend upon the good will of a state claiming an interest in the thing to enable it to execute its decree. All the world

are parties to such a suit, and of course are bound by the sentence. The state may interpose her claim and have it decided. But she cannot lie by, and, after the decree is passed say that she was a party, and therefore not bound, for want of jurisdiction in the court."

Although those statements might suggest that the Eleventh Amendment has little application in *in rem* admiralty proceedings, subsequent decisions have altered that understanding of the federal courts' role. In *Ex parte New York*, 256 U. S. 490 (1921) *(New York I)*, the Court explained that admiralty and maritime jurisdiction is not wholly exempt from the operation of the Eleventh Amendment, thereby rejecting the views of Justices Story and Washington. *Id.*, at 497–498. On the same day, in its opinion in *Ex parte New York*, 256 U. S. 503 (1921) *(New York II)*, the Court likewise concluded that the federal courts lacked jurisdiction over a wrongful death action brought *in rem* against a tugboat operated by the State of New York on the Erie Canal, although the Court did not specifically rely on the Eleventh Amendment in its holding.

The Court's most recent case involving an *in rem* admiralty action, *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), addressed whether the Eleventh Amendment "bars an in rem admiralty action seeking to recover property owned by a state." *Id.*, at 682 (internal quotation marks omitted). A plurality of the Court suggested that *New York II* could be distinguished on the ground that, in *Treasure Salvors*, the State's possession of maritime artifacts was unauthorized, and the State therefore could not invoke the Eleventh Amendment to block their arrest. 458 U. S., at 695–699 (citing *Ex parte Young*, 209 U. S. 123 (1908), and *Tindal* v. *Wesley*, 167 U. S. 204 (1897)). As the plurality explained, "since the state officials do not have a colorable claim to possession of the artifacts, they may not invoke the Eleventh Amendment to block execution of the warrant of arrest." 458 U. S., at 697.

That reference to a "colorable claim" is at the crux of this case. Both the District Court and the Ninth Circuit interpreted the "colorable claim" requirement as imposing a burden on the State to demonstrate by a preponderance of the evidence that the *Brother Jonathan* meets the criteria set forth in the ASA. See 102 F. 3d, at 386; 883 F. Supp., at 1349. Other Courts of Appeals have concluded that a State need only make a bare assertion to ownership of a res in order to establish its sovereign immunity in an *in rem* admiralty action. See, *e. g.*, *Zych*, 960 F. 2d, at 670.

By our reasoning, however, either approach glosses over an important distinction present here. In this case, unlike in *Treasure Salvors*, DSR asserts rights to a res that is not in the possession of the State. The Eleventh Amendment's role in that type of dispute was not decided by the plurality opinion in *Treasure Salvors*, which decided "whether a federal court exercising admiralty *in rem* jurisdiction may seize property held by state officials under a claim that the property belongs to the State." 458 U. S., at 683; see also *id.*, at 697 ("In ruling that the Eleventh Amendment does not bar execution of the warrant, we need not decide the extent to which a federal district court exercising admiralty *in rem* jurisdiction over property before the court may adjudicate the rights of claimants to that property as against sovereigns that did not appear and voluntarily assert any claim that they had to the res").

Nor did the opinions in *New York I* or *New York II* address a situation comparable to this case. The holding in *New York I* explained that, although the suit at issue was styled as an *in rem* libel action seeking recovery of damages against tugboats chartered by the State, the proceedings were actually "in the nature of an action *in personam* against [the Superintendent of Public Works of the State of New York], not individually, but in his [official] capacity." 256 U. S., at 501. The action in *New York II* was an *in rem* suit against a vessel described as being "at all times mentioned in the

libel and at present . . . the absolute property of the State of New York, in its possession and control, and employed in the public service of the State for governmental uses and purposes . . . ." 256 U. S., at 508. As Justice White explained in his opinion in *Treasure Salvors:*

> "The *In re New York* cases . . . reflect the special concern in admiralty that maritime property of the sovereign is not to be seized. . . . [They] are but the most apposite examples of the line of cases concerning *in rem* actions brought against vessels in which an official of the State, the Federal Government, or a foreign government has asserted ownership of the res. The Court's consistent interpretation of the respective but related immunity doctrines pertaining to such vessels has been, upon proper presentation that the sovereign entity claims ownership *of a res in its possession,* to dismiss the suit or modify its judgment accordingly." 458 U. S., at 709–710 (opinion concurring in judgment in part and dissenting in part) (emphasis added).

It is true that statements in the fractured opinions in *Treasure Salvors* might be read to suggest that a federal court may not undertake *in rem* adjudication of the State's interest in property without the State's consent, regardless of the status of the res. See, *e. g., id.,* at 682 (plurality opinion) ("The court did not have power . . . to adjudicate the State's interest in the property without the State's consent"); *id.,* at 711 (White, J., concurring in judgment in part and dissenting in part) ("It is . . . beyond reasonable dispute that the Eleventh Amendment bars a federal court from deciding the rights and obligations of a State in a contract unless the State consents"). Those assertions, however, should not be divorced from the context of *Treasure Salvors* and reflexively applied to the very different circumstances presented by this case. In *Treasure Salvors,* the State had possession—albeit unlawfully—of the artifacts at issue. Also, the

opinion addressed the District Court's authority to issue a warrant to arrest the artifacts, not the disposition of title to them. As the plurality explained, "[t]he proper resolution of [the Eleventh Amendment] issue . . . does not *require*— or permit—a determination of the State's ownership of the artifacts." *Id.*, at 699 (emphasis added); see also *id.*, at 700 (noting that while adjudication of the State's right to the artifacts "would be justified if the State voluntarily advanced a claim to [them], it may not be justified as part of the Eleventh Amendment analysis, the only issue before us"). Thus, any references in *Treasure Salvors* to what the lower courts could have done if they had solely adjudicated title to the artifacts, rather than issued a warrant to arrest the res, do not control the outcome of this case, particularly given that it comes before us in a very different posture, *i. e.*, in an admiralty action *in rem* where the State makes no claim of actual possession of the res.

Nor does the fact that *Treasure Salvors* has been cited for the general proposition that federal courts cannot adjudicate a State's claim of title to property, see, *e. g.,* Idaho v. *Coeur d'Alene Tribe of Idaho,* 521 U. S. 261, 289–290 (1997) (O'CONNOR, J., concurring in part and concurring in judgment); *id.,* at 305–306 (SOUTER, J., dissenting), prevent a more nuanced application of *Treasure Salvors* in the context of the federal courts' *in rem* admiralty jurisdiction. Although the Eleventh Amendment bars federal jurisdiction over general title disputes relating to state property interests, it does not necessarily follow that it applies to *in rem* admiralty actions, or that in such actions, federal courts may not exercise jurisdiction over property that the State does not actually possess.

In considering whether the Eleventh Amendment applies where the State asserts a claim in admiralty to a res not in its possession, this Court's decisions in cases involving the sovereign immunity of the Federal Government in *in rem* admiralty actions provide guidance, for this Court has recognized a correlation between sovereign immunity principles

applicable to States and the Federal Government. See *Tindal* v. *Wesley*, 167 U. S., at 213; see also *Treasure Salvors, supra*, at 710 (White, J., concurring in judgment in part and dissenting in part) (discussing analogy between immunity in "*in rem* actions brought against vessels in which an official of the State, the Federal Government, or a foreign government has asserted ownership of the res"). In one such case, *The Davis*, 10 Wall. 15 (1870), the Court explained that "proceedings *in rem* to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under process of the court." *Id.*, at 20. The possession referred to was "an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication." *Id.*, at 21; see also *The Siren*, 7 Wall. 152, 159 (1869) (describing "exemption of the government from a direct proceeding *in rem* against the vessel whilst in its custody"). The Court's jurisprudence respecting the sovereign immunity of foreign governments has likewise turned on the sovereign's possession of the res at issue. See, *e. g., The Pesaro*, 255 U. S. 216, 219 (1921) (federal court's *in rem* jurisdiction not barred by mere suggestion of foreign government's ownership of vessel).

While this Court's decision in *The Davis* was issued over a century ago, its fundamental premise remains valid in *in rem* admiralty actions, in light of the federal courts' constitutionally established jurisdiction in that area and the fact that a requirement that a State possess the disputed res in such cases is "consistent with the principle which exempts the [State] from suit and its possession from disturbance by virtue of judicial process." *The Davis, supra*, at 21. Based on longstanding precedent respecting the federal courts' assumption of *in rem* admiralty jurisdiction over vessels that are not in the possession of a sovereign, we conclude that the Eleventh Amendment does not bar federal jurisdiction

over the *Brother Jonathan* and, therefore, that the District Court may adjudicate DSR's and the State's claims to the shipwreck. We have no occasion in this case to consider any other circumstances under which an *in rem* admiralty action might proceed in federal court despite the Eleventh Amendment.

## III

There remains the issue whether the courts below properly concluded that the *Brother Jonathan* was not abandoned for purposes of the ASA. That conclusion was necessarily influenced by the assumption that the Eleventh Amendment was relevant to the courts' inquiry. The Court of Appeals' determination that the wreck and its contents are not abandoned for purposes of the ASA was affected by concerns that if "the vessel had been partially abandoned, both the federal court and the state court would be adjudicating the fate of the *Brother Jonathan.*" 102 F. 3d, at 389. Moreover, the District Court's inquiry was a preliminary one, based on the concern that it was premature "for the court to find that any individual items of cargo or personal property have been abandoned." 883 F. Supp., at 1354. In light of our ruling that the Eleventh Amendment does not bar complete adjudication of the competing claims to the *Brother Jonathan* in federal court, the application of the ASA must be reevaluated. Because the record before this Court is limited to the preliminary issues before the District Court, we decline to resolve whether the *Brother Jonathan* is abandoned within the meaning of the ASA. We leave that issue for reconsideration on remand, with the clarification that the meaning of "abandoned" under the ASA conforms with its meaning under admiralty law.

Our grant of certiorari also encompassed the question whether the courts below properly concluded that the ASA pre-empts § 6313, which apparently operates to transfer title to abandoned shipwrecks not covered by the ASA to the State. Because the District Court's full consideration of the

application of the ASA on remand might negate the need to address the pre-emption issue, we decline to undertake that analysis.

Accordingly, the judgment of the Court of Appeals assuming jurisdiction over this case is affirmed, its judgment in all other respects is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

In *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), both the four Members of the plurality and the four dissenters agreed that the District Court "did not have power . . . to adjudicate the State's interest in the property without the State's consent." *Id.*, at 682; see also *id.*, at 699–700; *id.*, at 703, n. (White, J., concurring in judgment in part and dissenting in part). Our reasons for reaching that common conclusion were different, but I am now persuaded that all of us might well have reached a different conclusion if the position of Justices Story and Washington (that the Eleventh Amendment is no bar to any *in rem* admiralty action) had been brought to our attention. I believe that both opinions made the mistake of assuming that the Eleventh Amendment has the same application to an *in rem* admiralty action as to any other action seeking possession of property in the control of state officers.

My error, in writing for the plurality, was the assumption that the reasoning in *Tindal* v. *Wesley*, 167 U. S. 204 (1897), and *United States* v. *Lee*, 106 U. S. 196 (1882), which supported our holding that Treasure Salvors was entitled to possession of the artifacts, also precluded a binding determination of the State's interest in the property. Under the reasoning of those cases, the fact that the state officials were acting without lawful authority meant that a judgment against them would not bind the State. See 458 U. S., at 687–688 ("In holding that the action was not barred by the

Eleventh Amendment, the Court in *Tindal* emphasized that any judgment awarding possession to the plaintiff would not subsequently bind the State"). That reasoning would have been sound if we were deciding an ejectment action in which the right to possession of a parcel of real estate was in dispute; moreover, it seemed appropriate in *Treasure Salvors* because we were focusing on the validity of the arrest warrant.

Having given further consideration to the special characteristics of *in rem* admiralty actions, and more particularly to the statements by Justice Story and Justice Washington quoted in the Court's opinion, *ante*, at 502–503* I am now convinced that we should have affirmed the *Treasure Salvors* judgment in its entirety. Accordingly, I agree with the Court's holding that the State of California may be bound by a federal court's *in rem* adjudication of rights to the *Brother Jonathan* and its cargo.

JUSTICE KENNEDY, with whom JUSTICE GINSBURG and JUSTICE BREYER join, concurring.

I join the opinion of the Court. In my view, the opinion's discussion of *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), does not embed in our law the distinction between a State's possession or nonpossession for purposes of Eleventh Amendment analysis in admiralty cases. In light of the subsisting doubts surrounding that case and JUSTICE STEVENS' concurring opinion today, it ought to be evident that the issue is open to reconsideration.

---

*See also Fletcher, A Historical Interpretation of the Eleventh Amendment, 35 Stan. L. Rev. 1033, 1078–1083 (1983) (discussing the historical basis for this interpretation).