**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1610

ANGELEX LTD., as owner of the M/V Antonis G. Pappadakis,
and the M/V Antonis G. Pappadakis in rem,

Petitioner - Appellee,

v.

UNITED STATES OF AMERICA; UNITED STATES COAST GUARD; UNITED
STATES CUSTOMS AND BORDER PROTECTION AGENCY,

Respondents – Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk.   Robert G. Doumar, Senior
District Judge.  (2:13-cv-00237-RGD)

Argued:  June 25, 2013                  Decided:  July 22, 2013

Before KING, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion.  Judge Thacker wrote
the opinion, in which Judge King and Judge Floyd joined.

**ARGUED**:   Douglas  Neal  Letter,  UNITED  STATES  DEPARTMENT  OF
JUSTICE,  Washington,  D.C.,  for  Appellants.   George  Michael
Chalos, CHALOS & CO, P.C., Oyster Bay, New York, for Appellee.
**ON BRIEF**:  Neil  H.  MacBride,  United  States  Attorney,  Alexandria,
Virginia,  Stuart  F.  Delery,  Acting  Assistant  Attorney  General,
Matthew  M.  Collette,  Anne  Murphy,  UNITED  STATES  DEPARTMENT  OF
JUSTICE, Washington, D.C., for Appellants.

THACKER, Circuit Judge:

The United States of America, the United States Coast Guard, and the United States Customs and Border Protection Agency (collectively, "Respondents" or the "government") appeal the district court's order, which, upon an emergency petition filed in the Eastern District of Virginia, (1) altered the terms of a bond the Coast Guard had fixed for the release of a detained ship that was under investigation; and (2) restricted the types of penalties the government could seek for the ship's potential violations of certain ocean pollution prevention statutes. As explained below, this matter was not subject to review in the district court because the Coast Guard's actions were committed to agency discretion by law. As a result, the district court lacked jurisdiction to consider the petition and we, therefore, reverse and remand for dismissal under Federal Rule of Civil Procedure 12(b)(1).

I.

A.

We begin with the international and domestic legal landscape underlying this matter. The United States is a signatory to MARPOL, which is a multi-national treaty aimed at "achiev[ing] the complete elimination of international pollution of the marine environment by oil and other harmful substances and the minimization of accidental discharge of such

2

substances[.]"[1]  Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, Feb. 17, 1978, 1340 U.N.T.S. 61, 128.  MARPOL requires member States to prohibit violations of the treaty through domestic laws, and to provide penalties "adequate in severity to discourage violations of [MARPOL]."  Id. at 186.

In fulfilling its obligations pursuant to MARPOL, Congress enacted the Act to Prevent Pollution from Ships ("APPS").  See 33 U.S.C. §§ 1901-15.  According to APPS, "the Secretary shall administer and enforce" MARPOL, as well as statutes and regulations designed to preserve the marine environment.  Id. § 1903(a).  The term "Secretary" is defined as "the Secretary of the department in which the Coast Guard is operating."  Id. § 1901(a)(11).  At all times relevant to this appeal, the Coast Guard operated under the Department of Homeland Security ("DHS").

The regulations attendant to APPS require, in relevant part, that certain oil-carrying ships must "maintain" an Oil Record Book ("ORB"), and

---

[1] The term "MARPOL" refers to two international conventions: the 1973 International Convention for the Prevention of Pollution from Ships, and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships.

> [e]ntries shall be made in the [ORB] . . . whenever any of the following machinery space operations take place on any ship to which this section applies -- (1) Ballasting or cleaning of fuel oil tanks; (2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks; (3) Disposal of oil residue; and (4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces.

33 C.F.R. § 151.25(a), (d); see also United States v. Ionia Mgmt. S.A., 555 F.3d 303, 309 (2d Cir. 2009) (holding that "the APPS's requirement that subject ships 'maintain' an ORB, 33 C.F.R. § 151.25, mandates that these ships ensure that their ORBs are accurate (or at least not knowingly inaccurate) upon entering the ports or navigable waters of the United States"); United States v. Jho, 534 F.3d 398, 403 (5th Cir. 2008) ("[W]e read the requirement that an oil record book be 'maintained' as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."). A person who knowingly violates APPS or its attendant regulations commits a Class D felony. See 33 U.S.C. § 1908(a).

## B.

There are two Petitioners in this appeal: the Antonis G. Pappadakis ("Pappadakis" or "the vessel"), an ocean-going bulk cargo carrier, which was built in 1995 and registered in Malta; and Angelex Ltd. ("Angelex"), a company that purchased

4

the vessel on March 9, 2007. The vessel is Angelex's sole income-earning asset. Angelex contracted with a third party, Kassian Maritime Navigation Agency, Ltd. ("Kassian"), a Greek company, to serve as the vessel's operator. Kassian also operates several other cargo ships and is not a petitioner in this appeal.[2]

The events giving rise to this action began on April 14, 2013. On that day, the Pappadakis arrived at the Norfolk Southern Terminal in Norfolk, Virginia, and loaded a cargo of coal for delivery to a customer in Brazil. The next day, on April 15, 2013, Coast Guard inspectors conducted a routine Port State Control inspection of the Pappadakis. While Coast Guard personnel were aboard the vessel, a crewmember passed a note to one of the inspectors, which stated that the vessel's oily water separator had been bypassed and oily bilge water had been discharged overboard. The letter also alleged that this discharge was not reported in the ORB. Upon further inspection, the Coast Guard discovered that the Pappadakis's oily water

---

[2] Kassian was previously prosecuted in 2007 for violating APPS in materially identical circumstances to those presented here. Kassian pleaded guilty, paid a fine of $1 million, and received a sentence of 30 months probation. See United States v. Kassian Maritime Navigation Agency, No. 3:07-cr-0048 (M.D. Fla. Aug. 17, 2007), ECF No. 133.

separator was inoperable, the vessel had likely been discharging bilge water overboard, and the ORB was incomplete or falsified, in contravention of MARPOL and APPS.

The Coast Guard referred its findings to the Department of Justice for possible prosecution. It also informed Angelex that the Pappadakis's clearance to depart Norfolk had been withheld, and negotiations for a security agreement between the Coast Guard and counsel for Angelex began.[3]

After a few days, the negotiations stalled with the Coast Guard requiring the posting of a $2.5 million bond, a number of non-monetary obligations intended to ensure the availability and cooperation of the crewmembers and officials, and consent to the United States's continued jurisdiction over the matter. Unable to further negotiate with the Coast Guard, and claiming to be losing money by the day, Angelex and the

---

[3] APPS provides, as codified as 33 U.S.C. § 1908(e),

> If any ship subject to the MARPOL Protocol . . . or this chapter, its owner, operator, or person in charge is liable for a fine or civil penalty under this section, or if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Treasury, upon the request of the Secretary [of the DHS], shall refuse or revoke [departure] clearance . . . . <u>Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary</u>.

33 U.S.C. § 1908(e) (emphasis supplied).

6

Pappadakis (in rem) then filed an emergency petition on April 25, 2013, in the Eastern District of Virginia, seeking immediate release of the Pappadakis or imposition of an appropriate bond (the "Petition").[4]

Specifically, the Petition asked the court "to fix an amount of security for release of the [Pappadakis]" because (1) the Coast Guard was not authorized and was wrongfully withholding clearance; (2) the vessel was improperly detained; (3) the amount of surety bond being demanded was "unjustified as a matter of fact, law, equity and good conscience and beyond the Coast Guard's authority"; (4) such actions were "causing serious, irreparable harm" to Angelex and the vessel; and (5) the government was improperly making Angelex "act[] as the government's proxy in detaining [the crewmembers] for an indefinite and unlimited amount of time, without lawful authority and in violation of their rights to due process of law." J.A. 7.

---

[4] The Petition, entitled "Emergency Petition and Motion for Release of the Motor Vessel 'Antonis G. Pappadakis,' or alternatively, to Fix an Appropriate Bond Amount for the Immediate Release of the Vessel and to Protect the Rights, Liberties and Freedoms of the Vessel's Crew," is found at J.A. 6-33. (Citations to the "J.A." refer to the contents of the Joint Appendix filed by the parties in this appeal.)

7

C.

The district court held a hearing on the Petition on May 6, 2013. It recessed court and encouraged the parties to come up with an agreeable bond determination. The parties met for several hours and ultimately reached an agreement of $1.5 million bond and other agreed conditions, subject to approval from the Coast Guard Headquarters in Washington, D.C. ("Headquarters"). But when the court reconvened, the government attorney advised that the settlement had been rejected by Headquarters. According to the district court, that attorney also advised that pursuant to guidance from Headquarters, the Coast Guard "firmly refuses to accept less than the $2.5 million bond it had previously offered." J.A. 629.[5]

On May 8, 2013, the district court filed a memorandum opinion, explaining that it possessed subject matter jurisdiction based on the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. (the "APA"), and federal question jurisdiction, 28 U.S.C. § 1331; or, in the alternative, in rem admiralty jurisdiction, 28 U.S.C. § 1333. It then determined that the government had acted unconstitutionally and outside its

---

[5] At oral argument, there was dispute amongst the parties as to whether or not negotiations continued beyond the Coast Guard's take it or leave it offer of a $2.5 million bond. Regardless, this debate does not alter our analysis.

8

statutory authority by demanding excessive bond for clearance and by insisting that any security agreement include certain non-monetary conditions. See Angelex Ltd. v. United States, 2:13-cv-00237 (E.D. Va. May 8, 2013), ECF No. 21 (J.A. 624-39). In a contemporaneous four-page order, the district court set forth new bond conditions. Specifically, the order directed Angelex to post a surety bond in the sum of $1.5 million. The order specified that the government could initiate either civil or criminal proceedings, but not both, and established other bond conditions, including the following:

> [T]he owner will maintain in the Eastern District of Virginia, at the owner's cost and expense, [six named officers and] crew members of said vessel for no greater than one month, and said crew members shall be functionally detained under material witness status so that their deposition may be taken. . . .

> [T]he owner will return, at its cost and expense, Gerasimos Patsalias, Master of said vessel, for either the civil or criminal proceedings (only one or the other) brought against Petitioners under [APPS]. . . .

> [T]he owner agrees to provide Lt. Elizabeth Oliveira, of the United States Coast Guard, with the name, address and telephone number of the hotel or other place where each of said ship's officers and crew members may be located when housed pursuant to the conditions of said bond in the Eastern District of Virginia.

> Upon the posting of . . . the said bond all parties to this action shall take all actions necessary to immediately release said vessel from arrest and allow it to proceed from this port and issue any and all permits that may be necessary to allow it to proceed out of this port in its trade.

Id., ECF No. 20 at 2-3 (J.A. 621-22).

On May 9, 2013, the government requested that the district court temporarily stay the order, simultaneously filing a notice of appeal and requesting a stay from this court. The district court denied the stay motion on May 10, 2013. That same day, this court granted a stay that was extended, on May 16, 2013, to encompass the pendency of this appeal. Thereafter, we implemented an expedited briefing schedule and heard argument at the Greenbrier County Courthouse in Lewisburg, West Virginia, on June 25, 2013.[6]

Because the district court's order enjoined the United States to comply with the conditions set forth therein, we possess jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). In addition, insofar as the order constitutes the final decision of the district court, we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[6] On May 22, 2013, the grand jury in the Eastern District of Virginia indicted Angelex, Kassian, and the vessel's chief engineer, Lambros Katsipis, on multiple charges, including conspiracy to illegally discharge oily water into the sea, presentation of a falsified ORB, and obstruction of justice. See United States v. Kassian Maritime Navigation Agency, Inc., No. 2:13-cr-00070 (E.D. Va. May 22, 2013), ECF No. 12.

II.

In this appeal, the government challenges the subject matter jurisdiction of the district court, an issue that we review de novo.  See Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815 (4th Cir. 2003) (en banc).

III.

The district court asserted jurisdiction over this matter under the APA and pursuant to the court's admiralty jurisdiction.  For the following reasons, neither provides the court with the power to review the Coast Guard's actions in this case.

A.

The APA

1.

"Reviewability is a threshold jurisdictional question that must be determined before the merits of the case may be reached."  Sierra Club v. Larson, 882 F.2d 128, 130 (4th Cir. 1989). The APA "is not a jurisdiction-conferring statute." Lee v. U.S. Citizenship and Immigration Servs., 592 F.3d 612, 619 (4th Cir. 2010) (internal quotation marks omitted).  "[T]he jurisdictional source for an action under the APA is the federal question statute," and the APA's judicial provisions provide "a limited cause of action for parties adversely affected by agency action."  Id. (citations and internal quotation marks omitted).

11

Because "reviewability is a threshold jurisdictional question," however, we must examine reviewability through the lens of the APA to determine whether the district court properly exercised its jurisdiction.  Larson, 882 F.2d at 130.

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A). The APA further provides, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  Id. § 704.[7]  Of significance here, the APA provides two exceptions to judicial review of agency actions:  when "statutes preclude judicial review," or when "agency action is committed to agency discretion by law."  Id. § 701(a)(2).  The government argues that both exceptions apply here, and in any event, there is no "final agency action" of the Coast Guard.

Because the action that occurred in this case is explicitly committed to the discretion of the Coast Guard

---

[7] "Agency action" is defined as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13); see also id. § 701(b)(2).

12

pursuant to APPS, we conclude that this matter was unreviewable, and thus, the district court lacked subject matter jurisdiction.

a.

The idea that courts cannot review actions committed to agency discretion by law was at the forefront of two seminal Supreme Court cases: Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971), and Heckler v. Chaney, 470 U.S. 821 (1985). Volpe explained that § 701(a)(2) "is a very narrow exception" and "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Volpe, 401 U.S. at 410. Heckler further elucidated, however, that "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion" and "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion[.]" 470 U.S. at 830.

Our resolution of this matter is further informed by Speed Mining v. Federal Mine Safety & Health Review Commission, 528 F.3d 310 (4th Cir. 2008). Speed Mining, an owner-operator of a coal mine in West Virginia, petitioned for review of a decision from the Federal Mine Safety and Health Review Commission, which upheld citations for a crane hoist accident

13

that were issued by the Secretary of Labor. Speed Mining argued that, because the accident was caused by independent contractors, the Secretary's decision to cite Speed Mining itself was an abuse of discretion. See id. at 311.

This court held,

> It is settled law in this and other circuits that the Secretary possesses the discretionary authority to cite owner-operators . . . for safety violations committed by independent contractors. Moreover, there are no manageable standards in the Mine [Safety and Health] Act that enable us to review the Secretary's discretionary exercise of her enforcement authority.

Speed Mining, 528 F.3d at 311. As a result, "the Secretary's discretionary decision to cite [Speed Mining] for the crane hoist accident is 'committed to agency discretion by law,' and therefore unreviewable." Id. at 317. Additionally, "[t]he discretionary decision as to which operator to cite for a Mine Act violation rests on a 'complicated balancing of a number of factors which are peculiarly within' the Secretary's expertise[.]" Id. at 318.

b.

The circumstances in this case substantially mirror those described by the Supreme Court in Heckler and our court in Speed Mining. By its Petition, Angelex asserts that the Coast Guard acted "arbitrarily, capriciously, and unreasonably" in detaining the Pappadakis, setting a bond which Angelex cannot post, and demanding a security agreement with terms that are not

14

authorized by the operative statute, 33 U.S.C. § 1908(e). J.A. 7. But § 1908(e) grants the Coast Guard broad discretion to deny bond altogether, and it can dictate the terms of any bond that it may accept. See Giuseppe Bottiglieri Shipping Co. v. United States, 843 F. Supp. 2d 1241, 1248 (S.D. Ala. 2012) ("Congress did not require the Coast Guard to accept a bond or other surety in any case," or "grant an absolute right to a vessel owner to obtain departure clearance[.]").

Furthermore, the language of § 1908(e) does not provide any "judicially manageable standards" by which to review the Coast Guard's actions. Heckler, 470 U.S. at 830. There are no specific guidelines as to when clearance should or should not be granted in APPS, and Congress did not "outline (even in the broadest brushstrokes) the parameters for what form or amount a bond or other surety should take." Giuseppe, 843 F. Supp. 2d at 1248. The reasonableness of the Coast Guard's decision cannot be determined pro forma in a vacuum, but only in the context of the standards intended by Congress. As a result, this is a situation where the statute at issue is "'drawn in such broad terms that . . . there is no law to apply.'" Heckler, 470 U.S. at 830 (quoting Volpe, 401 U.S. at 410); see also Larson, 882 F.2d at 132-33 (holding that federal court could not review Federal Highway Administration's (FHWA) decision not to enforce certain provisions of the Highway Beautification Act (HBA),

15

explaining, "[t]he relevant question here is whether the HBA provides standards for ascertaining when the FHWA should recommend that formal enforcement proceedings be commenced or when the Secretary is <u>required</u> to make a determination of compliance or non-compliance or to institute an enforcement action. As to these points, the statute is silent. Therefore, there is no law to apply and appellant has failed to overcome the presumption of unreviewability.").

2.

Despite these bars to review, the district court nonetheless decided it possessed jurisdiction to review the Coast Guard's bond determination because, even when Congress has committed a specific decision to an agency's discretion by law, "the federal courts retain jurisdiction to review discretionary agency actions for abuse of discretion." J.A. 633 (citing <u>Elecs. of N.C., Inc. v. Se. Power Admin.</u>, 774 F.2d 1262, 1267 (4th Cir. 1985); <u>Littell v. Morton</u>, 445 F.2d 1207, 1211 (4th Cir. 1971)). But, as the government points out, to adopt this argument would be to "eliminate Section 701(a)(2) from the statute, by providing 'abuse of discretion' review for all discretionary agency decisions, regardless of whether Congress has committed them exclusively to the agency or not." Appellant's Br. 40. In fact, <u>Heckler</u> rejected this very argument, explaining that even though the APA sets forth an

16

"abuse of discretion" review of agency action in 5 U.S.C. § 706, the § 701(a)(2) exception for actions committed to agency discretion still applies to "a separate class of cases," as here, in which a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler, 470 U.S. at 830.

Angelex asserts, "the very purpose for Angelex's pursuit of judicial intervention -- and a significant basis for the District Court's decision -- was the Coast Guard's actions beyond its statutory authority and its violation of Angelex's constitutional due process rights." Appellees' Br. 33. Angelex contends that because it raises the "indisputable existence of specific statutory construction issues, various violations of its due process rights, and other constitutional concerns as a result of the Coast Guard's overreaching of its statutory authority," there are clearly "manageable standard[s]" to apply here. Id. at 36.

We are cognizant of this court's declaration,

> [E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations, but they may not review agency action where the challenge is only to the decision itself.

Elecs. of N.C., 774 F.2d at 1267 (internal quotation marks omitted). Nonetheless, we disagree with Appellees'

17

characterization of the Petition as an attack on the statutory authority or constitutionality of the Coast Guard's actions. First, Appellees cannot with a straight face argue that the Coast Guard has acted outside the bounds of § 1908(e). Indeed, those bounds are quite limitless. The Coast Guard may demand a low bond, a high bond, or may refuse to grant clearance altogether. See 33 U.S.C. § 1908(e) ("Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." (emphases added)); see also 46 U.S.C. § 60105(b) ("[A] vessel that is not a vessel of the United States shall obtain clearance from the Secretary before proceeding from a port of place in the United States." (emphasis added)). Further, once the Coast Guard makes its clearance determination, the "Secretary of the Treasury, upon the request of the Secretary [of the DHS], shall refuse or revoke [departure] clearance[.]" Id. In other words, if the Coast Guard requests that clearance be refused or revoked, it is mandatory that such action occur. In this case, the Coast Guard requested that the Customs and Border Protection ("CBP") withhold the Pappadakis's departure clearance, and the "Customs hold was approved by CBP on April 19, 2013." J.A. 68. This action is specifically permitted in the text of § 1908(e).

Likewise, Angelex's attempt at turning this matter into a constitutional challenge does not make the matter

18

reviewable and thus, vest the district court with jurisdiction. Specifically, Angelex asserts that the government violated its due process rights by indefinitely detaining the Pappadakis. This attempt at bypassing the reviewability exception in § 701(a)(2) falls flat. As Appellants observed, Angelex's case is "nothing more than a direct review of the specific conditions sought by the Coast Guard in order to allow departure," Appellant's Rep. Br. 8, and we "may not review agency action where the challenge is only to the decision itself," Elecs. of N.C., 774 F.2d at 1267. Furthermore, we reiterate that the Coast Guard's actions are specifically endorsed by the text of § 1908(e). The release of the vessel upon the filing of a bond or other surety is permissive, not mandatory, and is contingent only upon conditions "satisfactory to the Secretary." 33 U.S.C. § 1908(e). In short, the Coast Guard's stringent conformity to § 1908(e) simply does not give rise to a reviewable claim.

3.

Finally, APPS contains a built-in safeguard to governmental abuses, which further convinces us that Angelex's Petition is out of place and time. In addition to the criminal and civil penalties that APPS authorizes the United States to seek, APPS provides for compensation for loss or damage as a result of unreasonable detention by the Coast Guard. Section 1904(h) provides, "A ship unreasonably detained or delayed by

19

the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby." 33 U.S.C. § 1904(h). This provision is, as the government asserts, an "after-the-fact damages remedy against the United States for unreasonable detention or delay." Appellant's Br. 37. This safeguard gives Appellees a remedy, distinct from the unauthorized injunctive relief they now seek.

For these reasons, the Coast Guard's decisions regarding bond conditions with regard to the Pappadakis are unreviewable, and the district court thereby did not possess subject matter jurisdiction under the APA.

B.

Admiralty Jurisdiction

Judicial review of the Coast Guard's decision on bond and withholding of clearance is likewise unavailable to Angelex under the district court's in rem admiralty jurisdiction. The district court determined that the withholding of the Pappadakis for an indefinite period of time, subject to unattainable bond conditions "is tantamount to an arrest of the ship." J.A. 634. Likening such an arrest to a "proper maritime arrest," the district court asserted that the arrest of the vessel in rem falls within its admiralty jurisdiction. Id.

Pursuant to 28 U.S.C. § 1333(1), district courts have jurisdiction over "[a]ny civil case of admiralty or maritime

20

jurisdiction[.]"   Pursuant to the Supplemental Admiralty and Maritime Claims Rule E, such admiralty jurisdiction "applies to actions in personam with process of maritime attachment and garnishment, <u>actions in rem</u>, and petitory, possessory, and partition actions . . . ."   Fed. R. Civ. P. Adm. Rule E(1) (emphasis added).   An "in rem suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts."   <u>Am. Dredging Co. v. Miller</u>, 510 U.S. 443, 446-47 (1994).

Appellees unreasonably stretch the law to classify this matter as an <u>in rem</u> action.   The Coast Guard's withholding of the Pappadakis's departure clearance is not tantamount to an attachment pursuant to a civil action, such as a maritime lien.[8] <u>See</u> <u>California v. Deep Sea Research, Inc.</u>, 523 U.S. 491, 501 (1998) (observing that maritime jurisdiction encompasses "maritime causes of action begun and carried on as proceedings in rem, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien" (internal quotation marks omitted)). The Coast Guard is properly withholding the departure clearance

---

[8] "A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim," and it attaches "the moment the debt arises." <u>Dresdner Bank AG v. M/V Olympia Voyager</u>, 465 F.3d 1267, 1272 (11th Cir. 2006) (internal quotation marks and alterations omitted).

pursuant to its authority under § 1908(e), and not pursuant to any rule governing admiralty actions in rem.

Appellees also stretch the facts. They first cite to the Agreement, claiming that the demands therein "insist[] upon . . . hav[ing] the surety bond stand in place of the Vessel for the potential criminal fine or civil penalty imposed." Appellees' Br. 43. There is simply no support for this; in fact, the Agreement itself states, "[i]n consideration of the Surety Bonds, the United States agrees not to cause the arrest of the Vessel, nor the arrest, seizure or attachment or any other vessel owned, operated, managed or chartered by the Owner or Operator for the Alleged Violations[.]" J.A. 185.

Appellees then liken the Coast Guard's withholding of clearance to a "functional arrest" that was done in order to "provide the government with the ability to obtain financial security for a potential fine or penalty." Appellees' Br. 43 n.29. In so arguing, Appellees once again twist the facts such that what is actually discretionary action on the part of the Coast Guard under APPS is now considered an offense to the ship itself. Further, the Coast Guard's own regulations provide,

> statutes authorizing the Coast Guard to request denial or revocation of CBP clearance are not dependent on, limited in scope by, or equivalent to, the laws and procedures applicable to the assertion of an in rem claim against the vessel. Therefore, applying rules and practices developed with regard to asserting in

22

rem claims against vessels under admiralty law is inappropriate and not required.

69 Fed. Reg. 40400-01, 40401 (Jul. 2, 2004). In short, try as they might to make it so, Appellees' argument on this point simply does not fit either the law or the facts.

IV.

Pursuant to the foregoing, we reverse and remand for dismissal of the Petition for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

<u>REVERSED AND REMANDED</u>