# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 11, 2018          Decided November 2, 2018

No. 17-5269

ANGELEX, LTD.,
APPELLANT

v.

UNITED STATES OF AMERICA,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00056)

---

*George M. Chalos* argued the cause and filed the briefs for appellant.

*Anne Murphy*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Matthew M. Collette*, Attorney.

Before: TATEL and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Nearly forty years ago, Congress authorized the Coast Guard to detain ships suspected of

intentionally discharging oil and other contaminants into the sea. At the same time, Congress gave a ship "unreasonably detained or delayed" a cause of action to recover "any loss or damage suffered thereby." 33 U.S.C. § 1904(h). Until today, no circuit has considered the contours of this cause of action. Sailing into uncharted waters, we ask whether the Coast Guard acted reasonably in detaining a vessel for nearly six months pending a criminal trial after its owner and operator failed to meet the government's security bond demands. Measuring the reasonableness of the Coast Guard's actions by an objective standard, we find that the Coast Guard set a reasonable monetary bond. We also conclude that the nonmonetary components of the bond demand contributed nothing to the owner's losses. We therefore affirm the district court's award of summary judgment to the government.

## I.

The United States is a party to the 1973 International Convention for the Prevention of Pollution from Ships, as later supplemented by a protocol and several annexes (collectively, the "Convention"). *Watervale Marine Co. v. United States Department of Homeland Security*, 807 F.3d 325, 327 (D.C. Cir. 2015). The Convention obliges member states to hold ships accountable for intentionally discharging oil and other contaminants into the ocean. *See id.*

Congress implemented the Convention through the Act to Prevent Pollution from Ships (the "Act"). *See* Pub. L. No. 96-478, 94 Stat. 2297 (1980) (codified as amended at 33 U.S.C. §§ 1901 et seq.). As amended, the Act authorizes the Department of Homeland Security to enforce the Convention and "prescribe any necessary or desired regulations to carry out" the Convention's obligations. 33 U.S.C. § 1903(c)(1). Pursuant to that authority, the Department requires ships to,

among other things, "maintain" an "Oil Record Book" that keeps track of the ship's oily discharges into the sea. 33 C.F.R. § 151.25(a), (d). "[K]nowingly violat[ing]" those regulations is a felony. 33 U.S.C. § 1908(a). It is undisputed in this case that a new violation occurs each time a ship enters a U.S. port with a non-compliant oil record book. "A ship operated in violation of" these rules is liable *in rem* for "any fine imposed under" the Act. *Id.* § 1908(d).

If the Coast Guard has "reasonable cause" to believe that a "ship, its owner, operator, or person in charge" may be liable under the Act, the Coast Guard may require Customs and Border Patrol ("Customs") to "refuse or revoke" the clearance required for a vessel to depart from American ports. *Id.* § 1908(e). While enforcement proceedings are pending, that clearance may nonetheless be granted "upon the filing of a bond or other surety satisfactory to the Secretary" of Homeland Security. *Id.* Consistent with the United States's obligations under the Convention—and central to this case—the Act, through section 1904(h), also creates a cause of action for a "ship unreasonably detained or delayed" to recover "compensation for any loss or damage suffered thereby." *Id.* § 1904(h); *see* International Convention for the Prevention of Pollution from Ships, art. 7(2), Nov. 2, 1973, 12 I.L.M. 1319, 1340 U.N.T.S. 184 (entered into force on Oct. 2, 1983).

Appellant, Angelex, Ltd., owns the Maltese-flagged *M/V Antonis G. Pappadakis*, a nearly 750-foot-long bulk carrier subject to the Convention. Kassian Maritime Navigation Agency, Ltd.—not a party to this lawsuit—chartered the vessel in 2013 to carry a load of coal. In the district court, Angelex conceded that Kassian was the ship's "operator," as the Act uses that term. *See* 33 U.S.C. § 1901(a)(9). Lambros Katsipis served as the ship's chief engineer during the 2013 voyage.

In April 2013, the *Pappadakis* arrived at the port of Norfolk, and Coast Guard agents boarded for a routine inspection. A crewmember passed the inspectors a note confiding that the chief engineer was using a "magic pipe"—a device designed to covertly dump water containing oil residue—to avoid reporting discharges in the oil record book.

Investigating the allegation, the Coast Guard searched the ship and interviewed crew members. The on-board investigation ended after one week, on April 19, and on the same day, the port captain sent Angelex and Kassian a letter saying that the investigation established "reasonable grounds" to believe that the *Pappadakis* had violated the oil record book requirements. The Coast Guard therefore directed Customs to withhold the ship's departure clearance.

Negotiations ensued to reach an agreement that would allow the *Pappadakis* to sail pending prosecution. Initially, the Coast Guard demanded "that Angelex and Kassian jointly and severally post a bond in the amount of $3 million." U.S. Statement of Material Facts ¶ 66, Joint Appendix (J.A.) 140. It also required Angelex and Kassian to agree to several nonmonetary bond conditions designed to facilitate further investigation and trial. These conditions included "expressly waiving all jurisdictional defenses, paying the salaries and expenses for several crewmembers to remain in the Eastern District of Virginia, stipulating to the authenticity of all documents and items seized from the *Pappadakis*, and assisting the United States in effecting service on foreign citizens not located in the United States." *Id.*

Angelex and Kassian both protested that, strapped for cash, they were unable to meet those demands. In particular, Angelex claimed in an email that it was "in a dire financial condition" and purported to attach its "most recent financial

statements" to prove that its free cash reserves topped out at $174,000, while its liabilities exceeded $10.5 million. Email from George M. Chalos, J.A. 93. Two days later, according to Angelex, it sent the Coast Guard updated financial documents, this time showing free cash reserves of nearly $800,000 and a ship mortgage of nearly $11 million. Both emails summarized the contents of the financial statements in no more than two sentences. The Coast Guard eventually reduced its demand to $2.5 million, but it would go no lower.

With negotiations at an impasse, and the *Pappadakis* stuck in Norfolk, Angelex took the Coast Guard to court. It filed an emergency petition for relief in the Eastern District of Virginia, and Senior District Judge Robert G. Doumar quickly convened a hearing. Halfway through, the court ordered a recess and urged the parties to settle. At first, that effort appeared to succeed: the parties agreed in principle for Angelex to comply with all of the Coast Guard's nonmonetary conditions and post a monetary bond of $1.5 million. But Coast Guard headquarters overruled its line negotiators, holding fast to the $2.5 million demand, and the deal fell through.

Two days later, Judge Doumar granted Angelex's petition. He did not mince words, saying of the Coast Guard's bond demands that he could "recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion" in his over thirty-year judicial career. *Angelex Ltd. v. United States*, No. 2:13-cv-237, 2013 WL 1934490, at *9 (E.D. Va. May 8, 2013). He ordered the government to accept the terms negotiated during the recess: $1.5 million plus the Coast Guard's nonmonetary conditions. *Id.* at *10. The Fourth Circuit granted the government's motion for an emergency stay and eventually reversed on the ground that the district court lacked subject-

matter jurisdiction. *Angelex Ltd. v. United States*, 723 F.3d 500, 502, 505 (4th Cir. 2013).

Meanwhile, a grand jury returned an indictment charging Angelex, Kassian, and Katsipis with, among other things, three counts each of failing to maintain an accurate oil record book—one count each for three separate entries into U.S. ports. After a trial, the jury convicted Katsipis on the three oil record book counts, but acquitted Angelex and Kassian of all charges.

The Coast Guard detained the *Pappadakis* in Norfolk until the trial ended, and the ship finally sailed just over three weeks after the jury's verdict. In total, the Coast Guard held the vessel for a little under six months.

In January 2015, Angelex filed this civil action alleging that the Coast Guard had unreasonably delayed the *Pappadakis* and seeking compensation for expenses and losses under section 1904(h). Following discovery, the parties cross-moved for summary judgment, and the district court granted the government's motion.

The court adopted a balancing approach to reasonableness under section 1904(h), "imposing an obligation on the Government to balance its own specific and legitimate enforcement interests with the interests of the vessel's other stakeholders." *Angelex Ltd. v. United States*, 272 F. Supp. 3d 64, 76 (D.D.C. 2017). The court then turned to Angelex's arguments that the Coast Guard acted unreasonably.

First, the district court rejected Angelex's contention that the Coast Guard should have given greater weight to the vessel's mortgage and the company's financial situation because Angelex failed to support those arguments with admissible evidence. Specifically, the court pointed out that Angelex had introduced into the record none of the financial

attachments that it supposedly sent the Coast Guard during the bond negotiations. That left the emails from Angelex's counsel to Coast Guard officials as the only evidence of the company's fiscal state. The district court also disregarded those emails because, in its view, they were "unqualified hearsay" and therefore inadmissible at trial. *Id.* at 78.

The court turned to the proposed $2.5 million monetary bond, holding that, as a matter of law, "any bond amount up to, and including, the maximum possible fines and penalties is necessarily within a range of reasonableness." *Id.* at 84. And, having found that the maximum fine in this case was $3 million, the court deemed the Coast Guard's $2.5 million demand *per se* reasonable.

Finally, as to the nonmonetary bond conditions, the district court read section 1904(h) to require the Coast Guard's conduct to have actually contributed to the length of time that the ship was detained or delayed, and it found that the nonmonetary conditions could not possibly have extended the *Pappadakis*'s delay, based in part on Angelex's admission "that, during the initial litigation before Judge Doumar," it was prepared to "accept *all* of the non-financial conditions if the Coast Guard would be willing to lower the bond amount to just $1.5 million." *Id.* at 87. Since Angelex had agreed to accept all of those conditions, the court reasoned, any additional delay could not be attributed to the nonmonetary conditions.

Having rejected all of Angelex's arguments that the Coast Guard harmed Angelex by behaving unreasonably, the district court entered judgment in favor of the government. Angelex timely appealed, and our review is de novo. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996).

## II.

"[S]ummary judgment is proper if . . . there is no genuine issue as to any material fact . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). Once the moving party has met its "initial responsibility of informing the . . . court of the basis for its motion," *id.* at 323, the party opposing summary judgment must point to "specific facts showing that there is a genuine issue for trial," *id.* at 324 (internal quotation marks omitted). To succeed, "the non-moving party must produce evidence capable of being converted into admissible evidence" that would allow a reasonable factfinder to return a verdict in its favor. *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks and alterations omitted).

Section 1904(h) requires a party seeking damages to prove two elements. First, the Coast Guard must have "unreasonably detained or delayed" the ship. Whether the Coast Guard acted "unreasonably" is a question of law. *See Carter v. Bennett*, 840 F.2d 63, 64-65 (D.C. Cir. 1988) (whether facts satisfy a statutory standard of "reasonable" is a "conclusion of law"). Second, as a result of the detention or delay, the ship must have suffered "loss or damage." Therefore, summary judgment for the government is proper if the claimant fails to come forward with adequate evidence to support either of those elements as a matter of law.

With these principles in hand, we take up Angelex's several arguments that it is entitled to relief under section 1904(h). Broadly speaking, Angelex claims that it suffered losses because of the delay prompted by: (1) the Coast Guard's detention of the *Pappadakis* through trial despite the absence of an adequate evidentiary basis to do so; and (2) the government's unreasonable bond demands. We consider each contention in turn.

**A.**

We begin with Angelex's argument that the protracted detention was unreasonable because it was unauthorized. Although Angelex does not challenge the Coast Guard's initial decision to detain the *Pappadakis*, it claims the Coast Guard had no basis for holding the ship all the way through the trial because, at some unspecified point in the investigation, it became clear "that there was no evidence which would support vicarious liability for Angelex (or Kassian)." Appellant's Br. 42. As Angelex sees it, the Coast Guard lost authority to continue holding the ship once the alleged absence of evidence became apparent. This argument misses the mark.

As this court recognized in *Watervale Marine Co. v. United States Department of Homeland Security*, when the Coast Guard has "reasonable cause" to believe a ship is being operated in violation of the Act, it may "hold the ship in port until legal proceedings are completed." 807 F.3d at 330. And a validly obtained indictment generates in a subsequent civil proceeding a "rebuttable presumption" that the government had probable cause at the time of the indictment, which can be undermined only by "evidence that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Moore v. Hartman*, 571 F.3d 62, 69 (D.C. Cir. 2009).

Here, a grand jury had sufficient basis to indict both Angelex and Kassian, and Angelex has given us no basis for distinguishing between the "reasonable cause" required to detain a ship and the "probable cause" necessary to indict. Thus, so long as the indictment was valid and there were no material post-indictment developments, the detention was authorized.

10

The only evidence Angelex cites to question the extended detention's authorization is a single statement from the government's lead investigator, who testified that she did not "specifically" do anything "to investigate the basis to vicariously charge Angelex." Appellant's Br. 44 (internal quotation marks omitted). At most, that statement implies that the government conducted no separate investigation focused on corporate liability; it does nothing to suggest "that the indictment was produced by . . . wrongful conduct undertaken in bad faith" or that the initial basis for detaining the ship had eroded. *Moore*, 571 F.3d at 69. We thus agree that the Coast Guard had section 1908(e) authority to detain the *Pappadakis* "until legal proceedings [were] completed." *Watervale*, 807 F.3d at 330.

**B.**

Of course, a detention may be unreasonable even if authorized. Angelex's second, and more substantial, argument is that its case falls into that category because of the government's allegedly unreasonable bond demands.

Before considering the merits of that argument, we observe that the parties appear to agree on a threshold proposition, which we therefore assume is true for this case: that a detention or delay is unreasonable if the bond demand is excessive or otherwise inappropriate.

We start with the monetary demand. The district court thought that any bond amount below the statutory maximum fine for which the ship could be liable *in rem* is *per se* reasonable. We certainly agree that any bond amount below the maximum criminal fine will *often* be reasonable, but we are reluctant to adopt such a bright line rule. Calculation of the maximum fine is less straightforward than the district court assumed. *See* 18 U.S.C. § 3571(c), (d) (setting the maximum

fine at \$500,000 per count, but authorizing an "[a]lternative fine based on" the defendant's "gain or loss"); 33 U.S.C. § 1908(b) (authorizing additional civil penalties per violation, per day). And a party may well be able to demonstrate, with appropriate evidence, that failure to deviate from the maximum—however calculated—was unreasonable. But this is not such a case: Angelex's arguments that a \$2.5 million bond amount was unreasonable are meritless.

Angelex first argues that the Coast Guard should set bond based not on the maximum statutory fine, but rather on the fine the district court is likely to impose. As the district court rightly observed, that approach is often impractical: "there is . . . no reason to expect that anyone can accurately predict what fines or penalties a court might impose at some point in the future after trial." *Angelex*, 272 F. Supp. 3d at 84. It was thus perfectly reasonable for the Coast Guard to start by focusing instead on the maximum potential fine in formulating a bond demand.

Next, Angelex disputes that \$3 million was the maximum fine that the *Pappadakis* could have been liable for *in rem*. Specifically, it claims that Kassian's potential liability cannot be included because Kassian had no "equitable interest" in the vessel. Appellant's Br. 28. That argument ignores how the statute's *in rem* liability scheme works. The Act makes "[a] ship operated in violation" of the oil record book regulations itself liable for "*any* fine imposed" as a result. 33 U.S.C. § 1908(d) (emphasis added). And it authorizes prosecution of any "person" who "knowingly violates" the regulations, a category of potential defendants that plainly includes a vessel's operator. *Id.* § 1908(a). The statute therefore puts the ship on the hook for Kassian's share. As for what that share comes to, the statute permits three alternatives: \$500,000 per count, "twice the gross gain" derived by the defendant, or "twice the gross loss" to any third party. *See* 18 U.S.C. § 3571(c)(3), (d).

And that leaves aside any civil penalties the government might seek, which the government can also pursue *in rem* against the ship. *See* 33 U.S.C. § 1908(b), (e). Given the six total counts against Angelex and Kassian, it was therefore no error for the district court to conclude that the maximum fine in this case was at least $3 million.

Angelex's next tack is to claim that the Coast Guard's demand was unreasonable given the company's financial state at the time. It argues that the Coast Guard had no hope of actually recovering *in rem* given the huge mortgage on the ship and that posting the bond would effectively have put Angelex out of business. For its part, the government argues that Angelex's ability to pay and the government's likelihood of actually recovering are entirely irrelevant to the reasonableness of the bond amount.

We can resolve this case without deciding whether those issues are relevant under section 1904(h). Assuming they are, to succeed on this argument Angelex would have to show that the information reasonably available to the Coast Guard reliably conveyed the relevant financial data. Any other approach would effectively require the Coast Guard to conduct its own independent investigation of a company's financial status—an unreasonable demand given the time and tools at the agency's disposal.

As the party opposing summary judgment, Angelex therefore had the burden of identifying the financial information that the Coast Guard could have relied on. It has failed to do so. As the district court accurately observed, Angelex entered into the record none of the financial documents that it supposedly sent the Coast Guard. *See Angelex*, 272 F. Supp. 3d at 78, 85 n.14. Although Angelex challenged that finding at oral argument, it never properly

anchored that claim in the record, *see* Fed. R. App. P. 28(a)(8)(A) (requiring "citations to the . . . parts of the record on which the appellant relies"); in any event, we have independently scoured the record and, like the district court, have come up empty.

Angelex's omission of those documents is fatal. Without them, the district court had no way of assessing whether the Coast Guard's $2.5 million demand reasonably took account of the information those documents contained. And regardless of whether the emails summarizing those documents would have been admissible at trial, the district court could not have relied solely on their bare-bones, self-serving statements to assess the information available to the Coast Guard. At oral argument, Angelex claimed that if the case went to trial, its own witnesses would corroborate those emails. Perhaps so, but counsel assertions at oral argument cannot create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a "party asserting that a fact . . . is genuinely disputed" to cite, among other things, "affidavits or declarations"). Anyway, that trial testimony would leave the core problem unaddressed: the district court would still be unable to review the documents available to the Coast Guard at the time of its decision.

Angelex repeatedly seeks to bolster its position by invoking Judge Doumar's observation that the Coast Guard's demands amounted to the most "egregious abdication of the reasonable exercise of discretion" he had ever seen. *Angelex*, 2013 WL 1934490, at *9. Although it is true, as the government argues, that the Fourth Circuit's reversal turns the order into a "*legal* nullity," *Khadr v. United States*, 529 F.3d 1112, 1116 (D.C. Cir. 2008) (emphasis added), the order remains part of the historical record, and a party might still be able to use it as evidence of what a reasonable contemporaneous observer might have concluded.

Nevertheless, under the circumstances of this case, the order affords Angelex no help. Judge Doumar's finding rested on two considerations that have not withstood the test of time. First, Judge Doumar believed that the only permissible reason to detain the ship was for eventual *in rem* recovery, and so he discounted the Coast Guard's interest in retaining custody of witnesses and evidence for trial. *Angelex*, 2013 WL 1934490, at *8. As we observed in *Watervale*, however, that is a false dichotomy: obviously the government cannot collect *in rem* without successfully prosecuting the case. 807 F.3d at 329-330 ("[A] financial bond, given its limited use, is ordinarily not satisfactory" because "nothing prevents the ship, after posting the bond, from sailing away."). Moreover, the government's interest in enforcing environmental laws extends beyond merely collecting a fine. Second, Judge Doumar assumed that the maximum fine was only $1.5 million, apparently omitting Kassian's potential liability. *Angelex*, 2013 WL 1934490, at *8-9. As we have explained, however, the maximum fine in this case was at least $3 million. Finally, there is a crucial difference between this litigation and Angelex's emergency petition: Angelex presented Judge Doumar with the underlying financial documents that are missing here. *See Angelex*, No. 2:13-cv-237, ECF No. 4-8 (E.D. Va. Apr. 25, 2013). Given all these differences, Judge Doumar's finding has no appreciable probative value for the district court in this case.

Angelex also insists that the proposed bond amount was unreasonable when compared to other cases. It identifies only one: the *M/V Thetis*. Appellant's Br. 39. According to Angelex, the Coast Guard was willing to accept a lower bond in that case ($1 million) despite the "near-identical nature of the . . . charges." *Id.* at 39-40. But, as the government points out, that case differs from this one significantly: unlike the *Thetis*'s operators, Kassian had a criminal history, having pled guilty to an oil record book violation in the past. *See United States v.*

*Kassian Maritime Navigation Agency, Ltd.*, No. 3:07-cr-48 (M.D. Fla. Aug. 17, 2007). Thus, the Coast Guard had a reasonable basis for suspecting that the *Pappadakis* was more likely to evade prosecution and potentially re-offend than the *Thetis*—possibilities that explain the higher bond demand in this case.

Lastly, Angelex objects to the process that the Coast Guard employed to formulate its bond demand. It alleges that the Coast Guard officers who handled the *Pappadakis* case failed to adequately consider or respond to various factors, such as the financial state of Angelex and Kassian and the detention's impact on crew members and the cargo owner. It also claims that confusion existed within the Coast Guard about who exactly held final decisionmaking authority to set bond. The government tersely responds that the test must be "objective," Appellee's Br. 35, which we take to mean that the test should give no consideration to these process-based concerns.

We agree with the government that the Act imposes an objective, outcome-oriented test, but we think some additional explanation is warranted. "Legal tests based on reasonableness are generally objective . . . ." *Kentucky v. King*, 563 U.S. 452, 464 (2011). In practice, this means that such tests usually disregard what government officers were thinking and instead focus on what they actually did in light of the information with which they can reasonably be charged. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("constitutional reasonableness" does not depend on a police officer's "actual motivations"). And, as this court is acutely aware, Congress knows how to make an agency's decisionmaking processes subject to review when it wants to. *See, e.g.*, 5 U.S.C. § 706(2)(A) (review of "arbitrary" or "capricious" "findings" and "conclusions" in the Administrative Procedure Act); 42 U.S.C. § 4332(C) (requirement of a "detailed statement by the

responsible official" in the National Environmental Policy Act). Section 1904(h) contains no such language. Accordingly, we see no basis for believing that Congress intended to impose a reasoned decisionmaking requirement in that provision, meaning that Angelex cannot support its argument by pointing to the process the agency employed for setting bond.

Turning to the nonmonetary conditions, we agree with the district court that it is unnecessary to decide whether those conditions were reasonable because they caused Angelex no harm. But we arrive at that conclusion by a somewhat different route.

The district court held that section 1904(h) requires the "unreasonable terms and conditions" of the bond to have "resulted in a [detention or] delay." *Angelex*, 272 F. Supp. 3d at 87. But the statutory text sets up a slightly different causation question: whether the unreasonable detention or delay resulted in loss or damage. *See* 33 U.S.C. § 1904(h) (ships "unreasonably detained or delayed" are "entitled to compensation for any loss or damage suffered *thereby*" (emphasis added)).

In some cases, framing the question that way might yield different results, but this case is not one of them because Angelex's entire theory of loss stems from the *Pappadakis*'s delay. Thus, Angelex had to present evidence that the Coast Guard's nonmonetary conditions contributed to that delay to establish that they contributed to its claimed losses. At the hearing before Judge Doumar, however, Angelex agreed that it would have accepted all those nonmonetary conditions when combined with a $1.5 million bond. Oral Arg. Rec. 12:59-13:06 ("Angelex agreed" to all nonmonetary conditions). The record contains no evidence that Angelex ever retracted that agreement. Angelex now suggests that the total burden of

compliance with the nonmonetary conditions plus the cash bond led it to reject the settlement offer, but—as with the company's finances—we have no way to assess that claim because Angelex has made no specific argument regarding (much less produced any evidence of) the compliance cost. Thus, we are left with no basis for concluding that Angelex's losses resulted from the nonmonetary conditions.

In short, the record contains no evidence to support a finding that the Coast Guard acted unreasonably in demanding that Angelex and Kassian post a $2.5 million bond, or that the other nonmonetary assurances resulted in any additional loss or damage to Angelex.

## C.

In a final bid to salvage its case, Angelex recites a list of supposedly "disputed" facts that it insists preclude summary judgment as a procedural matter. But Angelex's list primarily regurgitates all the facts we have just discussed: the nonmonetary bond conditions and the financial information Angelex supposedly provided to the Coast Guard. Those facts, however, are undisputed. What Angelex really disputes is whether those facts rendered the Coast Guard's actions unreasonable. But that determination—"whether the facts satisfy the statutory standard" of reasonableness—is a legal issue, not a factual one. *Carter*, 840 F.2d at 64-65 (internal quotation marks omitted). The only genuinely disputed factual issues relate to who in the Coast Guard had decisionmaking authority and what those officers actually considered, and as explained above, those disputes are irrelevant because the legal test for reasonableness is objective. We therefore find meritless Angelex's contention that a trial is required to resolve any lingering factual disputes.

18

## III.

For the foregoing reasons, we affirm the district court's order awarding summary judgment to the government.

*So ordered.*