PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2269
_____

NEDERLAND SHIPPING CORPORATION;
CHARTWORLD SHIPPING CORPORATION,

v.

UNITED STATES OF AMERICA

Nederland Shipping Corporation,
                                            Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-19-cv-01302)
District Judge:  Hon. Richard G. Andrews
_____

Argued
April 14, 2021

Before:   CHAGARES, JORDAN, and SCIRICA, *Circuit
Judges.*

(Filed: November 16, 2021)

_____

George M. Chalos   [ARGUED]
Chalos & Co.
55 Hamilton Avenue
Oyster Bay, NY   11771
      *Counsel for Appellant*

Anne Murphy   [ARGUED]
United States Department of Justice
Appellate Section
Room 7644
950 Pennsylvania Avenue, NW
Washington, DC   20004

Charles W. Scarborough
 United States Department of Justice
Appellate Section
Room 7244
950 Pennsylvania Avenue, NW
Washington, DC   20004
      *Counsel for Appellee*
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Delay is a serious problem in the transportation business, especially for shippers of perishable goods.  So, when a ship called the M/V Nederland Reefer (the "Reefer" or the "Vessel"), carrying a cargo of fruit, arrived in the Port of

Wilmington, Delaware in February of 2019, its crew thought the layover would be brief. Things did not turn out that way. After a Coast Guard inspection of the ship revealed evidence of an illegal discharge of bilge water,[1] the Reefer was held in port pending an investigation. The Reefer's owner, Nederland Shipping Corporation ("Nederland"), wanted to get the ship back to sea as rapidly as possible and so entered into a contract with the United States government to allow for the release of the Reefer in exchange for, among other consideration, a surety bond to cover potential fines.

Although Nederland delivered the bond and met its other requirements under the contract, the Vessel was detained in Wilmington for at least two additional weeks. Nederland sued in the United States District Court for the District of Delaware, but the government moved to dismiss the suit, arguing among other things that the District Court lacked subject matter jurisdiction. The District Court accepted that argument and dismissed the complaint, holding that Nederland's claims had to be brought in the United States Court of Federal Claims. More specifically, the District Court

---

[1] "Bilge," as a shorthand expression for bilge water, is sometimes used as a synonym for "nonsense," denoting disbelief and derision, *Bilge*, Cambridge Dictionary (2021), https://dictionary.cambridge.org/us/dictionary/english/bilge, but it has a literal maritime meaning too. Bilge water is the often noxious mixture of liquids that collects in the lowest compartment of a ship. *Bilge Water*, Cambridge Dictionary (2021), https://dictionary.cambridge.org/us/dictionary/english/bilge-water. Improperly disposing of it can lead to criminal liability, as further discussed herein.

held that the breach of contract claim did not invoke the Court's admiralty jurisdiction and that the statutory cause of action under the Act to Prevent Pollution from Ships (the "APPS") failed because the APPS did not waive the government's sovereign immunity. We disagree on both counts and will accordingly reverse and remand for further consideration.

## I.      BACKGROUND

The Reefer arrived at the Port of Wilmington, Delaware on February 20, 2019 for what Nederland expected to be a short stay. Upon shipboard inspection, however, the Coast Guard noticed evidence suggesting that the Vessel had violated the APPS.[2] Specifically, the Coast Guard suspected that the Vessel had discharged dirty bilge water directly overboard and misrepresented in its record book that the ship's oil water separator had been used to clean the bilge water prior to discharge. The Coast Guard accordingly detained the Reefer

---

[2] The Act to Prevent Pollution from Ships authorizes the Department of Homeland Security to enforce the 1973 International Convention for the Prevention of Pollution from Ships ("MARPOL") and to "prescribe any necessary or desired regulations to carry out" that treaty. 33 U.S.C. § 1903(c)(1); *see United States v. Abrogar*, 459 F.3d 430, 431-32 (3d Cir. 2006). It is a crime to "knowingly violate[ ]" those regulations or the APPS. 33 U.S.C. § 1908(a). "A ship operated in violation of" those laws "is liable in rem for any fine imposed[.]" *Id.* § 1908(d).

4

by withholding a departure clearance, under 33 U.S.C. § 1908(e) of the APPS.[3]

The Coast Guard's Captain of the Port issued a letter to the Vessel's representative on February 22, 2019, explaining the Coast Guard's authority to withhold the departure clearance and that clearance could be granted if the Vessel entered into a surety agreement that included providing a financial bond. To negotiate that agreement, Nederland sought

---

[3] The Coast Guard may "refuse or revoke" a vessel's departure clearance "if reasonable cause exists to believe" that the vessel may be subject to a fine under the APPS. 33 U.S.C. § 1908(e). The departure clearance may nonetheless be granted "upon the filing of a bond or other surety satisfactory to the Secretary" of Homeland Security. *Id.* Entitled "Ship clearance or permits; refusal or revocation; bond or other surety[,]" 33 U.S.C. § 1908(e) provides:

> If any ship subject to the MARPOL Protocol, Annex IV to the Antarctic Protocol, or this chapter, its owner, operator, or person in charge is liable for a fine or civil penalty under this section, or if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Treasury, upon the request of the Secretary [of Homeland Security], shall refuse or revoke the clearance required by section 60105 of Title 46 [to proceed from a port]. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary.

out Commander Robert Pirone of the Coast Guard. On March 7, Commander Pirone repeated that departure clearance could be obtained upon the issuance of a bond as part of a security agreement. He also told Nederland that the alleged discharge of bilge water had been referred to the Department of Justice for criminal prosecution under the APPS.

Seeking to get the Reefer underway again, Nederland signed an "Agreement on Security" (the "Agreement") with the United States on March 8, 2019. Nederland agreed to post a surety bond of $1 million, which would act as security for any adjudicated fines or penalties for violations of the APPS.[4] It also agreed to other provisions "[a]s consideration for surety satisfactory to the Secretary [of Homeland Security] for the release of the Vessel." (App. at 37.) Those provisions included consent to the jurisdiction of the United States over the criminal case and assurance that the thirteen crewmembers of the Reefer would remain in the United States to participate in the criminal trial, at the expense of Nederland. The Agreement also provided that "[a]ny dispute between the United States and Owner or Operator[, i.e., Nederland,] regarding payment under this paragraph shall be submitted to the United States District Court for the District of Delaware. ... [T]he party asserting that there has been a breach of the Agreement shall bear the burden of proof." (App. at 39.) In addition, the parties agreed that "the criminal and civil penalty claims of the United States against the Vessel in rem shall attach to the Vessel release's security as provided pursuant to the Federal Rules of Civil

---

[4] Nederland ended up entering a guilty plea in the criminal case. It paid a $900,000 fine.

6

Procedure, Admiralty, Maritime Claims, Supplemental Rule E(5)."  (App. at 46.)

On that same day, March 8, Coast Guard agents served the Reefer's crewmembers with subpoenas to testify before a grand jury in April.  Three days later, on March 11, Nederland's attorney informed Commander Pirone that all replacement crewmembers were on board the Reefer and had completed the handover from the thirteen crewmembers who were required to stay in Delaware.  But the Vessel did not receive a departure clearance.  After sending several emails asking for updates on the processing of paperwork for the detained crewmembers, Nederland's attorney told the government that the continuing delay of the Vessel had become unreasonable.  He also highlighted Nederland's right to pursue damages under 33 U.S.C. § 1904(h).[5]  In particular, he emphasized the economic losses that the Vessel would experience if the delay continued, including the costs associated with making alternative arrangements for its perishable cargoes and missing its next commercial commitment.  Nederland continued to ask for updates from the government, with little to no response, until March 28, 2019, when the Vessel was finally permitted to leave port.

Approximately three months later, Nederland filed for declaratory relief in the District Court under 33 U.S.C. § 1904(h), seeking a declaratory judgment that the Agreement

---

[5] Section 1904(h) provides: "Compensation for loss or damage [-] A ship unreasonably detained or delayed by the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby."  33 U.S.C. § 1904(h).

7

was null and void *ab initio* and asking for damages for breach of contract and compensation for unreasonable delay in allowing the Vessel's departure. The government moved to dismiss for failure to state a claim and for lack of subject matter jurisdiction.

The District Court was persuaded by the government's attack on subject matter jurisdiction. As to Nederland's breach of contract claim, the Court held that it did not have jurisdiction in admiralty because the Agreement is not a maritime contract, as the "principal objective of the Agreement is to permit the ship's departure clearance while preserving the Government's ability to investigate." (App. at 9.) Without the waiver of sovereign immunity attendant to admiralty jurisdiction, the claim could not proceed, the Court said, because the Agreement itself did not amount to a waiver of that immunity. As to the APPS cause of action under 33 U.S.C. § 1904(h), the Court held that § 1904(h) does not expressly waive sovereign immunity. According to the Court, the waiver of sovereign immunity found in the Tucker Act, 28 U.S.C. § 1491, could instead provide an avenue for relief for Nederland, but any such claim would have to be brought in the Court of Federal Claims.

Nederland now appeals.

## II.    DISCUSSION[6]

Nederland argues that the District Court erred in holding that it lacked subject matter jurisdiction in this case.

---

[6] We have appellate jurisdiction under 28 U.S.C. § 1291. Nederland asserted jurisdiction in the District Court

8

According to Nederland, the Agreement it entered with the government is maritime in nature and thus vested the Court with admiralty jurisdiction.[7]  Nederland also contends that its statutory cause of action for monetary damages under 33 U.S.C. § 1904(h) provides subject matter jurisdiction because it is an independent cause of action that waives the government's sovereign immunity.  The government counters that the Tucker Act waives sovereign immunity for non-tort monetary claims against the United States "founded … upon … any Act of Congress[,] … or upon any express or implied contract with the United States," and also provides exclusive jurisdiction for such claims in the Court of Federal Claims, 28 U.S.C. § 1491(a)(1), so that Nederland's suit must instead be brought in that court.

To prevail in this jurisdictional dispute, Nederland must clear two hurdles: it has to demonstrate that Congress provided for subject matter jurisdiction in the district courts over the claims at issue and that Congress waived sovereign immunity. *See United States v. Bormes*, 568 U.S. 6, 9-10 (2012) (explaining plaintiffs may only sue the United States for

---

under 28 U.S.C. §§ 1331 and 2201.  We address the District Court's jurisdiction herein.  We exercise plenary review to determine whether the District Court enjoyed subject matter jurisdiction.  *In re Allen*, 768 F.3d 274, 279 (3d Cir. 2014).

[7] Nederland also argues that the parties contracted for subject matter jurisdiction in the District Court.  That argument plainly fails because parties cannot create subject matter jurisdiction.  *See Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004) ("[P]arties may not confer subject matter jurisdiction by consent.").

9

monetary damages where sovereign immunity has been waived and subject matter jurisdiction exists). The parties do not dispute that if there is admiralty jurisdiction in this case, both conditions are satisfied for the contract claim, since federal courts have power to hear "all Cases of admiralty and maritime Jurisdiction[,]" U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1333, and Congress has waived sovereign immunity for claims brought in admiralty, *Henderson v. United States*, 517 U.S. 654, 665 (1996); 46 U.S.C. § 30903. The fight over the contract claim is thus whether it is a maritime claim and so properly subject to admiralty jurisdiction. As to the APPS statutory claim, the fight is whether 33 U.S.C. § 1904(h) waives sovereign immunity.

### A.    The Agreement is a maritime contract.

Nederland argues that the Agreement is maritime in nature and thus invokes the District Court's admiralty jurisdiction. The government responds that the Agreement primarily sought to facilitate a criminal investigation pursuant to the APPS and so is not a maritime contract. Nederland has the better of the argument.

The Supreme Court emphasized in *Norfolk Southern Railway Co. v. Kirby* that the primary interest of maritime jurisdiction is "the protection of maritime *commerce*." 543 U.S. 14, 25 (2004) (emphasis in original) (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991)). Consequently, we are looking to "the nature and character of the contract" at issue to determine whether it has "reference to maritime service or maritime transactions." *Id.* at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). A ship does not need to be directly

10

involved in the dispute for admiralty jurisdiction to attach, as "the admiralty and maritime jurisdiction ... extends to and includes cases of injury or damage ... caused by a vessel on navigable waters even though the injury or damage is done or consummated on land." *Id.* at 23-24 (quoting the Admiralty Jurisdiction Extension Act, 46 U.S.C. § 30101).

Following the two-step inquiry established more than a half-century ago in *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961), the *Kirby* Court asked first whether the contracts under review were maritime, and, second, whether they dealt with an inherently local dispute such that federal law should not control. *Kirby*, 543 U.S. at 22-23. It held that bills of lading for the transport of goods from Australia to Alabama were maritime contracts even though the final leg of the journey was via rail. *Id.* at 23-24. Because the bills of ladings' "primary objective" under the first step of *Kossick* was to "accomplish the transportation of goods by sea from Australia to the eastern coast of the United States[,]" the Court held that it was beside the point that part of the journey was by rail. *Id.* at 24. The Court also indicated, at the second step of *Kossick*, that no local interests had been suggested that would call federal jurisdiction into question. *Id.* at 27.

Following the same analytical path here, but in reverse order, we can quickly dispose of the "inherently local" issue. The dispute before us clearly implicates federal law – the APPS – and international concern with sea-going commerce and ocean pollution. It is thus obviously not inherently local. The issue, then, is the first question posed in *Kossick* and *Kirby*: what is the primary objective of the contract at issue. Not surprisingly, each party characterizes the Agreement's "primary objective" differently. *Id.* The government says the

11

primary objective of the Agreement was to allow "the criminal proceedings to continue to conclusion, including the payment of a potential criminal penalty." (Answering Br. at 23.) Nederland says instead that the primary objective of the Agreement was to provide sufficient security to obtain the Vessel's departure clearance so it could continue its trade. Both objectives are, it is true, contemplated in the Agreement, but the government's characterization ignores every interest but its own and, even at that, fails to acknowledge that the crime under investigation was itself particularly maritime in character. The government chooses to define its objective as simply pursuing a criminal prosecution, but that does not change the fact that the charge it was pursuing was a crime on the seas, outlawed by a maritime treaty. Nor does it change that both the Agreement (App. at 46) and the statute under which the government detained the vessel, 33 U.S.C. § 1908(d), speak in terms of liability in rem, which is language classically associated with admiralty jurisdiction. *See, e.g., Leon v. Galceran*, 78 U.S. 185, 190 (1870) ("[A] party may proceed *in rem* in the admiralty, and if he elects to pursue his remedy in that mode he cannot proceed in any other form, as the jurisdiction of the admiralty courts is exclusive in respect to that mode of proceeding[.]"). That is not determinative here, but it is telling.

What is determinative is that, contrary to the government's position, it did not need the Agreement to permit the criminal proceeding to continue to conclusion. The result of there having been no agreement and no surety bond would not have been the Reefer sailing away scot-free. It would have been the Coast Guard withholding the Vessel's departure clearance until the criminal proceedings ended. *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 807 F.3d 325, 330

(D.C. Cir. 2015) (Section 1908(e) "clearly provides authority in the Coast Guard to simply hold the ship in port until legal proceedings are completed."); *see also Angelex Ltd. v. United States* (*Angelex I*), 723 F.3d 500, 507 (4th Cir. 2013) (Section 1908(e) "grants the Coast Guard broad discretion to deny bond altogether[.]"). So the essential character and purpose of the Agreement was not to secure the Vessel and crew in port; that was already done. The primary objective of the Agreement was rather to set the Reefer free to pursue maritime commerce.[8]

---

[8] The parties also discuss the purposes of the APPS and MARPOL, both pointing to various aims of the treaty and its enacting legislation to support their characterizations of their Agreement's primary objective. The government argues that the APPS was "passed to implement various environmental obligations that the United States assumed when it entered into" MARPOL. (Answering Br. at 16 (quoting *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 807 F.3d 325, 327 (D.C. Cir. 2015)).) And Nederland contends that MARPOL not only sought to preserve the marine environment, but to balance those environmental concerns with "the desire not to impose laws which make shipping prohibitively expensive." (Reply Br. at 4-5 (quoting *United States v. Apex Oil Co. Inc.*, 132 F.3d 1287, 1291 (9th Cir. 1997)).) Such a concern was codified in § 1904(h), which provides a means by which ships unreasonably detained can seek compensation. 33 U.S.C. § 1904(h). Ultimately, however, "the nature and character of the contract" itself must guide our admiralty jurisdiction analysis – not a broader review of the treaty or the enabling legislation behind the particular contract. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (citation omitted).

13

The conclusion that the Agreement here has, as the saying goes, a "genuinely salty flavor," *Kirby*, 543 U.S. at 22 (citation omitted), is confirmed by other cases considering contracts that provide security in exchange for a vessel's freedom to continue on its journey. For example, in *Deval Denizcilik Ve Tigaret A.S. v. Agenzia Tripcovich S.R.L.*, the district court held that it had admiralty jurisdiction over a bank's guaranty to pay as a substitute for releasing cargo from arrest because it "ultimately hastened the delivery of the cargo by sea." 513 F. Supp. 2d 6, 9 (S.D.N.Y. 2007). Just as the ship's "cargo would not have been released had [the bank] not issued the guarantee[,]" Nederland's Vessel would not have been allowed to continue its maritime trade but for the Agreement. *Id.* Similarly, in *Great Eastern Shipping Co. v. Binani Cement Ltd.*, the district court held that a letter of indemnity promising to pay a bond to secure the release of a ship in exchange for the delivery of cargo was a maritime contract. 655 F. Supp. 2d 395, 399 (S.D.N.Y. 2009); *see also Compagnie Francaise De Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 778-79 (2d Cir. 1927) (holding admiralty jurisdiction existed over a contract to assume the performance of a bond "to release the res, or to prevent its arrest").

The government attempts to distinguish those cases by arguing that the security agreements at issue in them were for inherently maritime obligations, while securing a potential criminal penalty is not a maritime obligation. In drawing that contrast, the government again views its Agreement with Nederland solely from its own perspective, not recognizing the obvious commercial benefit to Nederland of freeing the Reefer to go to sea. On top of that, the distinction the government draws is unfounded. The *Deval* court did not premise its decision on the underlying charter contract, but instead

14

emphasized that the guaranty permitted maritime commerce to continue. 513 F. Supp. 2d at 9. That is a precise analog of deal in the Agreement here. So too in *Great Eastern Shipping*, the court stated that "Great Eastern's consideration was the prompt discharge of the cargo, a quintessentially maritime service, in forbearance of its right to demand the bills of lading on discharge, a quintessentially maritime right." 655 F. Supp. 2d at 399. It thus relied on its finding that the "overall purpose of the transaction ... was maritime" to conclude that the letter of indemnity was maritime in nature. *Id.* While the government rightly points out that both cases involved underlying commercial contracts, it was the discharge of the cargo to allow for uninterrupted maritime trade that rendered the contracts maritime in nature.

The government would prefer that we rely upon a case from the District of New Hampshire that was decided before *Kirby*. In *Chi Shun Hua Steel Co. v. Crest Tankers, Inc.*, the district court held that an agreement releasing the attachment of a vessel in exchange for posting security or bringing the vessel the following day to be reattached was a non-maritime contract. 708 F. Supp. 18, 22 (D.N.H. 1989). But, lacking the later guidance that the Supreme Court provided in the *Kirby* opinion, the *Crest Tankers* court determined whether the contract was maritime in nature by asking whether the contract "concerns transportation by sea, relates to navigation and concerns maritime employment." *Id.* Applying that outdated rule, the court held that the involvement of a ship did not bring the matter within its admiralty jurisdiction because "the settlement agreement itself was of a non-maritime nature." *Id.* Even if that reasoning were persuasive, it does not survive after *Kirby*. The *Kirby* Court specifically noted that "reference to maritime service or maritime transactions" can make a contract

15

maritime in nature. 543 U.S. at 24 (quoting *Hall Bros.*, 249 U.S. at 125). Reference to a vessel which has been detained, and which a surety agreement would free to continue its maritime trade, falls within the Supreme Court's definitional guidance.

For much the same reason, we are not persuaded by the cases that the District Court cited to support its jurisdictional conclusion. In saying it lacked jurisdiction, the Court first pointed to *Angelex I*, 723 F.3d at 509, which is inapposite because, although it concerned the withholding of a departure clearance for a vessel accused of violating the APPS, there was no underlying contractual agreement in that dispute. There, the Fourth Circuit held that the withholding of a vessel's departure clearance for an indeterminate amount of time – where the vessel owner could not afford to post bond – was not "tantamount to an arrest of the ship" and thus did not invoke in rem admiralty jurisdiction. *Id.* Because in rem admiralty actions involve a vessel being "treated as the offender and made the defendant by name or description in order to enforce a lien[,]" and "discretionary action on the part of the Coast Guard under APPS" cannot be considered "an offense to the ship itself," the Fourth Circuit concluded that subject matter jurisdiction was lacking. *Id.* at 509-10. That case would surely be on point and we would have to address its analysis if Nederland and the government had failed to negotiate a security agreement. But the parties here *did* negotiate a contract, and our jurisdictional inquiry must focus on whether the Agreement they entered into, pursuant to § 1908(e), constitutes a maritime contract – a question not raised in *Angelex I*.

The District Court also relied on *Retif Oil & Fuel, LLC v. Offshore Specialty Fabricators, LLC*, which held that a guaranty agreement to pay the debt owed on a contract for ship fuel and lube was a maritime contract. No. 17-7831, 2018 WL 4680125, at *5 (E.D. La. Sept. 28, 2018). The District Court in the instant case quoted *Retif Oil* for the proposition that "a 'surety agreement is held not to be an admiralty contract, since the obligation of the surety is only to pay damages in the event of liability on the underlying contract[.]'" (App. at 9 (quoting *Retif Oil*, 2018 WL 4680125, at *5).) The *Retif Oil* court concluded that the guaranty agreement before it, in contrast, was a promise to step into the shoes of the obligor and fully perform the underlying obligation by paying for the provisions if the other party did not. 2018 WL 4680125, at *6. So, the guaranty agreement at issue was more than a bare promise to pay damages and, thus, was a maritime contract. *Id*. But the hypothetical surety contract discussed in *Retif Oil* differs from the Agreement before us in a key aspect. Nederland did not merely promise to pay money in the event of liability; it promised to pay money and perform other undertakings in order to obtain a departure clearance so the Reefer could leave port and continue its maritime trade. In sum, both cases relied on by the District Court – *Angelex I* and *Retif Oil* – are distinguishable because they did not determine whether contracts providing security to allow a vessel to continue seagoing commerce are maritime in nature.

Finally, we note that the Agreement, which was drafted by the government, is premised on the explicit understanding that subject matter jurisdiction is proper in the District Court. For example, the Agreement provides that "the criminal and civil penalty claims of the United States against the Vessel in rem shall attach to the Vessel release's security as provided

17

pursuant to the Federal Rules of Civil Procedure, Admiralty, Maritime Claims, Supplemental Rule E(5)." (App. at 46.) We cannot conceive of a circumstance in which the government would contract to the applicability of Admiralty Supplemental Rule E(5) if it viewed potential breaches of the contract as not falling under admiralty jurisdiction.[9] In addition, the government agreed that "any" dispute "regarding payment under this paragraph shall be submitted to the United States District Court for the District of Delaware." (App. at 39.) At oral argument, counsel for the government said that this provision only refers to the United States' ability to sue Nederland for the payment of the bond. (See audio recording of oral argument held on April 14, 2021 at 30:00-31:57 (https://www2.ca3.uscourts.gov/oralargument/audio/20-2269_NederlandShippingv.USA.mp3).) But that assertion is belied by the very next sentence in the Agreement: "In any such dispute wherein one party claims a breach of the terms and conditions herein, the party asserting that there has been a breach of the Agreement shall bear the burden of proof." (App. at 39.) The use of the generic term "party[,]" rather than specifying that only the United States may sue in the District Court, plainly means that either party could commence litigation in the District Court. While the parties to a contract cannot confer subject matter jurisdiction on federal courts, and while the government's past or present positions on jurisdiction do not determine our conclusion, it is nevertheless revealing that the government's pre-litigation view of the law,

---

[9] The Supplemental Admiralty and Maritime Claims Rule E contemplates jurisdiction over "actions in personam with process of maritime attachment and garnishment, *actions in rem*, and petitory, possessory, and partition actions[.]" Fed. R. Civ. P. Adm. Rule E(1) (emphasis added).

as embodied in the form of contract it drafted, was that admiralty jurisdiction in a case like this existed in the District Court.

Given all of the foregoing, our view is that the District Court has admiralty jurisdiction over the breach of contract claim, as the primary objective of the Agreement was to secure the Vessel's departure clearance, so that it could continue its maritime trade.[10]

[10] Nederland fleetingly argues in the alternative that the contract is a "mixed" contract, meaning it contains both maritime and non-maritime elements. Mixed contracts do not fall within admiralty jurisdiction unless they are severable and may be separately adjudicated, *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992), and Nederland suggests only in a conclusory manner that the Agreement is severable. Because the contract's primary objective is maritime in nature and thus falls within admiralty jurisdiction, we need not address that alternative argument.

We do, however, briefly note the government's subsidiary arguments. It says that the Agreement contains no maritime clauses or terms "that might require the district court to draw upon its maritime expertise[.]" (Answering Br. at 25.) It fails, however, to cite any precedent to support its suggestion that a contract can only be maritime in nature if it requires a court to analyze the meaning of a maritime term. Lastly, it relies on *Kirby* to contend that "the core purpose of admiralty jurisdiction, uniformity in the law," is best served if APPS security agreements are always adjudicated in the Court of Federal Claims. (Answering Br. at 25-26.) But any uniformity concern cited by *Kirby* involved whether the contract at issue was inherently local or federal, not where in the federal system

19

**B.     The District Court erred in holding that it lacked subject matter jurisdiction over the APPS cause of action.**

Nederland also contends that the District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over its statutory cause of action because Congress explicitly waived the government's sovereign immunity for damages claimed under the APPS in 33 U.S.C. § 1904(h).[11] The government argues that Nederland's § 1904(h) claim is not cognizable as an independent cause of action and thus must be transferred to the Court of Federal Claims under the waiver of sovereign immunity provided by the Tucker Act.[12] We agree with Nederland because the APPS explicitly waives the government's sovereign immunity, making the Tucker Act immaterial to this dispute.

The Tucker Act waives the government's sovereign immunity for non-tort monetary claims against the United States founded upon "any Act of Congress," the Constitution,

---

the contract claim should be adjudicated. *Kirby*, 543 U.S. at 27-28.

[11] Nederland does not contend that the District Court enjoyed admiralty jurisdiction under 28 U.S.C. § 1333 over the statutory cause of action, and it is not necessary to consider that point.

[12] The government also says that Nederland forfeited its sovereign immunity waiver argument on appeal. Not so: Nederland argued that the APPS permits claims against the government through waiver of sovereign immunity.

or contracts, but it vests jurisdiction only in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1).[13] With that waiver, the Tucker Act "supplied the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable." *Bormes*, 568 U.S. at 12. It does not provide a substantive right to damages but instead opens the door to government liability for claims falling under its purview. *Chabal v. Reagan*, 822 F.2d 349, 355 (3d Cir. 1987). For a claim to have the advantage granted by the Tucker Act, it need only "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citation omitted). That "'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity[,]" and thus "an explicit provision for money damages" is not necessary. *Id.* at 472, 477.

Not all claims against the government, however, are reliant on the Tucker Act. Claims premised upon statutes that provide for independent causes of action and that waive the

---

[13] The Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulations of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

21

government's sovereign immunity need not be channeled through the Tucker Act. *See Bowen v. Massachusetts,* 487 U.S. 879, 910 n.48 (1988) ("Rather, [the Court of Federal Claims'] jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court."); *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1055 (D.C. Cir. 2014) ("If a separate waiver of sovereign immunity and grant of jurisdiction exist, district courts may hear cases over which, under the Tucker Act alone, the Court of Federal Claims would have exclusive jurisdiction." (citation omitted)); *Tritz v. U.S. Postal Serv.,* 721 F.3d 1133, 1137 (9th Cir. 2013) (While the Tucker Act "create[s] a presumption of exclusive jurisdiction in the Court of Federal Claims, ... that presumption can be overcome by an independent statutory grant of jurisdiction to another court."). Nederland argues that the APPS is one such statute, as it waives sovereign immunity and provides jurisdiction in the district courts, so resort to the Tucker Act, and transfer to the Court of Federal Claims, is unnecessary. The government, on the other hand, contends that the APPS should be interpreted as providing a cause of action under the Tucker Act but not as an independent waiver of sovereign immunity.

The government does not dispute that if the APPS waives sovereign immunity, jurisdiction would be proper in the District Court.[14] The question before us, then, is whether the

---

[14] The government cites *Chabal v. Reagan*, where, in denying jurisdiction over a former U.S. Marshal's suit for reinstatement, back pay, and damages for an allegedly improper removal, we explained: "Jurisdiction over non-tort monetary claims against the United States is exclusively

22

APPS indeed waives the government's sovereign immunity. The United States is immune from suit unless it expressly and unequivocally waives its immunity. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Statutory text purporting to waive governmental immunity is strictly construed "in favor of the sovereign." *United States v. Nordic Vill., Inc.,* 503 U.S. 30, 34 (1992) (internal quotation marks and citation omitted). Thus, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity," and "[a]mbiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the [g]overnment." *F.A.A. v. Cooper*, 566 U.S. 284, 290-91 (2012). There is no particular set of words that must be invoked to waive sovereign immunity, but the waiver must be discernable and explicit through traditional tools of statutory interpretation. *Id.* at 291. Furthermore, "[a] statutory waiver of sovereign immunity … defines the scope of a court's jurisdiction to entertain the suit." *Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 316 (3d Cir. 2020) (internal quotation marks and citations omitted). Consequently, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

---

defined by the Tucker Act, as codified at 28 U.S.C. §§ 1346, 1491, because it is only under the terms of the Tucker Act that the United States waives its sovereign immunity to non-tort claims seeking monetary relief." 822 F.2d 349, 353 (3d Cir. 1987). But, as later explained by the Supreme Court, that is merely an "assumption[,]" and Congress has the ability to waive sovereign immunity for other claims. *Bowen,* 487 U.S. at 910 n.48.

With all of that in mind, we conclude that there is a waiver of sovereign immunity for monetary damages in the plain text of the APPS. Section 1904(h), under which Nederland brings its statutory cause of action, provides: "Compensation for loss or damage [–] A ship unreasonably detained or delayed by the Secretary acting under the authority of this chapter is entitled to compensation for any loss or damage suffered thereby." 33 U.S.C. § 1904(h). The Fourth Circuit has dubbed that provision an "after-the-fact damages remedy against the United States for unreasonable detention or delay." *Angelex I*, 723 F.3d at 509.

By "entitl[ing] [a ship] to compensation for any loss or damage suffered" due to its detention or delay by the Secretary of Homeland Security, § 1904(h) clearly goes beyond providing a cause of action that is cognizable only under the Tucker Act. *Cf. White Mountain Apache Tribe*, 537 U.S. at 477 (comparing "the less demanding requirement" for finding a cause of action under the Tucker Act with the more demanding requirement for finding an independent waiver of sovereign immunity). We thus do not agree with the government that § 1904(h) provides a cause of action only in tandem with the Tucker Act's waiver of sovereign immunity. Rather, Congress provided "an explicit provision for money damages" by allowing for "compensation for any loss" caused by the Secretary's unreasonable detention of a ship. *Id*.; 33 U.S.C. § 1904(h). The provision need not explicitly state that "the United States" will pay compensation for any loss because, reading the provision in context as we must, *see King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty ... is to construe statutes, not isolated provisions" (internal quotation marks and citation omitted)), no other actor could logically be held liable. The federal government causes the unreasonable

24

detention, and the federal government thus provides compensation for the resulting loss or damage. *Cf. Cooper*, 566 U.S. at 291 ("We have never required that Congress use magic words" to waive sovereign immunity.). Congress intended to make the United States liable when a vessel is unreasonably detained by the Secretary of Homeland Security, and § 1904(h) is express and unequivocal in stating that waiver of sovereign immunity.[15] *Mitchell*, 445 U.S. at 538.

That conclusion comports with the opinion of the only other court of appeals to have considered a claim under § 1904(h). *See Angelex, Ltd. v. United States* (*Angelex II*), 907 F.3d 612, 623 (D.C. Cir. 2018) (affirming a grant of summary judgment for the government where a ship owner sought compensation under § 1904(h) for expenses after an allegedly unreasonable delay of its ship). In *Angelex II*, the D.C. Circuit

---

[15] Nederland also argues that Congress waived sovereign immunity for claims brought under the APPS through § 1910. That provision, entitled "Legal Actions[,]" provides that "any person having an interest which is, or can be, adversely affected, may bring an action" upon certain stated grounds "in the United States district court for any judicial district wherein the ship or its owner or operator may be found." 33 U.S.C. § 1910(a), (c)(3). Because we read § 1904(h) to expressly waive sovereign immunity, we need not resort to other sections of the APPS to reach our conclusion.

As a reminder, the government does not dispute jurisdiction in the District Court if the APPS waives sovereign immunity. As contemplated by 33 U.S.C. § 1908(d), "[a] ship operated in violation of the MARPOL Protocol … may be proceeded against in the United States district court of any district in which the ship may be found."

addressed a § 1904(h) claim on its merits without questioning or discussing subject matter jurisdiction. *Id.* at 618. The district court in that case had noted at the motion to dismiss stage that the government did not contest jurisdiction. *Angelex, Ltd. v. United States*, 123 F. Supp. 3d 66, 74 n.4 (D.D.C. 2015). While the government is correct to point out that "drive-by jurisdictional ruling[s]" carry little precedential weight, *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.*, 903 F.3d 65, 71 (3d Cir. 2018), it is notable that neither the district court nor the D.C. Circuit viewed subject matter jurisdiction over the § 1904(h) claim as worthy of discussion.

The government would have us reason that Congress may only displace the provisions of the Tucker Act through a statute with a "specific remedial scheme[,]" which the APPS does not have. (Answering Br. at 29 (quoting *Bormes*, 568 U.S. at 12).) Relying on *United States v. Bormes*, the government notes that the Supreme Court held a plaintiff could not avail himself of the Tucker Act's waiver of sovereign immunity because the Fair Credit Reporting Act contained its own self-executing remedial scheme, indicating that Congress intended to displace the Tucker Act. 568 U.S. at 10-11. When a litigant brings a claim under a statute with a self-executing remedial scheme that imposes monetary liability on the government, that law "supersedes the gap-filling role of the Tucker Act" because "precisely drawn, detailed statute[s] pre-empt[ ] more general remedies[.]" *Id.* at 12-13. So the government is quite right that *Bormes* described how "[t]he Tucker Act yields when the obligation-creating statute provides its own detailed remedies[.]" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1328 (2020) (citing *Bormes*, 568 U.S. at 13). But that case does not mandate deferral to the Tucker Act unless the other statute at issue has

26

a detailed remedial scheme. The issue is not the level of detail surrounding an alternative remedy; the issue is whether there is a clear waiver, and in the APPS there is.

Because there is no "plausible interpretation of the statute that would not authorize money damages against the [g]overnment[,]" we conclude that § 1904(h) waives the federal government's sovereign immunity. *Cooper*, 566 U.S. 284 at 290-91. Thus, under 28 U.S.C. § 1331, the District Court enjoyed jurisdiction over the independent statutory cause of action provided in 33 U.S.C. § 1904(h).

## III. CONCLUSION

For the foregoing reasons, we will reverse the order of the District Court and remand for consideration of Nederland's claims.